The issue in this case concerns successor corporation liability and grows out of a products liability action filed by plaintiff Springsteen against Matrix-Churchill and the Cyril Bath Company, Inc., under the Alabama Extended Manufacturer's Liability Doctrine. Matrix-Churchill cross-claimed seeking a declaratory judgment as to which of the defendant corporations would be liable to Springsteen should he prevail upon his claim. The trial court, sitting non-jury, found that Matrix-Churchill would be liable and dismissed the Cyril Bath Company, Inc., (Cyril Bath), directing an entry of final judgment pursuant to Rule 54 (b), A.R.Civ.P. Both Matrix-Churchill and Springsteen appeal. We reverse and remand.
The original Cyril Bath was founded as a sole proprietorship in 1914 by Cyril J. Bath. This business specialized in manufacturing metal forming and bending equipment. In 1941, the company was incorporated in Ohio.[1]
In 1969, a British company, Tube Investments, Ltd., through its subsidiary, Matrix-Churchill,[2] purchased substantially all of the outstanding common stock, 99.7% of the "old" Cyril Bath.
In 1972 or 1973, the "old" Cyril Bath began to manufacture an automobile repair lift, the "Bradbury Lift." *Page 784 
Sometime in 1975, Cyril Bath was advertised for sale, and, in 1976, negotiations began with Fairfield Machinery Company (Fairfield) of Columbiana, Ohio, for the purchase and sale of the entire operation of the "old" Cyril Bath, with the exception of the "Bradbury Lift" line of equipment. Ultimately, the agreement of purchase and sale was consummated, in June 1976. As evidence thereof, Cyril Bath, as "Seller," Matrix-Churchill, and TCBC Company, as "Buyer," executed an agreement containing some 36 pages of provisions.
TCBC was a corporation created in April 1976 as a vehicle for acquiring "old" Cyril Bath, and the name, TCBC, was intended as a temporary name while the purchase was being effected. The stockholders of TCBC were Fairfield and Robert C. McFarland, president of TCBC Company.
The purchase agreement recognized that the "old" Cyril Bath organization involved "separate identifiable businesses," the Bradbury lift business, on the one hand, and "the manufacture and sale of press brakes, stretch forming machinery, and contract forming services, on the other hand. It was this second business that was the subject of the sale agreement. The purchase price was $802,958. This amount allocated $702,958 to the purchased assets and the remainder to the value of an option to purchase the land and building of the "old" Cyril Bath. A press release was delivered to the Cleveland PlainDealer newspaper to the effect that Fairfield, through a subsidiary, "will purchase a substantial portion of the assets and business of Cyril Bath," which was described as "a manufacturer of metalforming machinery [which] also does contract work." It added:
 "According to Mr. Alex Shashaty, President, Fairfield intends to continue the present operations of The Cyril Bath Company, and believes that significant growth will result from this acquisition."
The purchase and sale agreement included the sale of the name "The Cyril Bath Company." Thus approximately one month after the sale, TCBC changed its name to Cyril Bath, referred to hereinafter as "new" Cyril Bath.
The agreement also provided that the seller, "old" Cyril Bath, would change its name to one not similar to Cyril Bath. Pursuant thereto, on June 7, 1976, "old" Cyril Bath changed its name to AQL, Inc. The only assets owned by AQL, Inc., at that time were the plant and building which were subject to the option purchased by "new" Cyril Bath.
The agreement also contained a non-competition clause whereby "old" Cyril Bath and Matrix-Churchill agreed not to engage directly or indirectly with the business conducted by TCBC, later "new" Cyril Bath, the business described as "the manufacture and sale of press brakes, stretch forming machinery and contract forming services and commercial use thereof."
Additionally, the agreement contained the following disclaimer:
 "Section 1.02. Buyer is expressly not assuming any liabilities of Seller whatsoever except with regard to:
 "(a) Performance after the Closing of the leases of tangible chattel property listed on Exhibit `D';
 "(b) Performance after the Closing of the license agreements, contracts and contract orders listed on Exhibit `E';
 "(c) Performance of contracts with customers entered into in the ordinary course of business; and
 "(d) Performance after the Closing under the Lease with regard to real property, taxes and other charges, which, but for the Lease, would be liabilities of Seller."
In an equity distribution conducted early in 1978, Matrix-Churchill, as a major stockholder, received the plant and building of AQL, Inc., which had continued in existence since the 1976 transaction. It also continued to collect receivables and to make payments. Although operations closed down and no employees were retained, officers and directors continued as required by Ohio law. On October 10, 1978, AQL, Inc., was formally dissolved *Page 785 
and a final distribution of remaining assets was made to its shareholders, primarily to Matrix-Churchill.
After the 1976 purchase and sale, "new" Cyril Bath manufactured and sold six press brakes to the United States Government. These machines were made to government specifications and were dissimilar to the "old" designs and engineering files of the "old" Cyril Bath. There is some evidence that the press brake line of the "old" Cyril Bath had become unprofitable by 1975 and was considered by the "new" Cyril Bath as a "dead line," i.e., an obsolete product.
From the time of the sale in 1976 until 1979, "new" Cyril Bath occupied the building which had housed "old" Cyril Bath, at which time "new" Cyril Bath moved its operation to Monroe, North Carolina.
Plaintiff, Richard Springsteen, was an employee of Halstead-Mitchell Company at its plant in Scottsboro, Alabama. He claimed to have suffered an injury while working at a press brake manufactured by Cyril Bath. He filed an action against the "new" Cyril Bath, against certain co-employees, and against Matrix-Churchill as successor in interest to the "old" Cyril Bath. Extensive pleading and discovery ensued. As indicated above, Matrix-Churchill asked for a declaratory judgment determining the responsibility as between it and "new" Cyril Bath for an injury to Springsteen.
 I. The Potential Liability of Matrix-Churchill
The trial court, sitting without a jury by agreement of the parties, heard the case on August 31, 1983. The testimony of Robert McFarland, President of "new" Cyril Bath was taken, and the depositions of Messrs. Homza, Kiggen, and Ellis were admitted into evidence. On October 4, 1983, the trial court entered a final order finding that a de facto merger had occurred between "old" Cyril Bath and Matrix-Churchill before the sale of the Cyril Bath assets to "new" Cyril Bath. The trial court cited our cases of Andrews v. John E. Smith's SonsCo., 369 So.2d 781 (Ala. 1979), and Rivers v. Stihl, Inc.,434 So.2d 766 (Ala. 1983), and noted that those cases had spoken approvingly of Turner v. Bituminous Casualty Company, 397 Mich. 406, 244 N.W.2d 873 (1976).
Following this order, Matrix-Churchill moved for a new trial on the following ground, among others:
 "2. For that the testimony presented in this cause namely that of Robert McFarland, the president of the New Cyril Bath Company indicated that the new company, that is the New Cyril Bath Company, did not advertise press brakes or promote their sales in any way or identify themselves with the press brake or product brake line. Further, that in the deposition taken by Cyril Bath Company in this cause, Mr. McFarland testified at Page 14 of that deposition that they did not advertise in any trade publication. That subsequent to the trial and the testimony taken in this cause, the defendant, Matrix-Churchill has ascertained that the said New Cyril Bath Company does, in fact, advertise and in fact has a listing in the Thomas Register of 1983, a copy of listing in the register is attached hereto wherein the New Cyril Bath Company advertises that they do, in fact, manufacture press brakes. . . .
 "3. For that the attorneys for the defendant, Matrix-Churchill did not have this information in hand at the trial of this cause which was tried before this Honorable Court on the 31st day of August 1983.
 "4. For that the findings of the court are based upon the testimony of Mr. McFarland and in the findings of the court, the court states that the New Cyril Bath Company did not hold itself out as a manufacturer of press brakes when, in fact, the advertisement from the Thomas Register showed that this is incorrect.
 "5. For that the finding of the court would have been changed had the defendant, Matrix-Churchill been allowed to have the information regarding the advertisements in the Thomas Register.
 "6. For that the knowledge of this advertisement was totally within the hands of the defendant, Cyril Bath Company, *Page 786 
and that the testimony offered by Cyril Bath Company did not lead one to conclude that such advertisements were made."
After a hearing on this motion, the trial court amended its order of October 4, 1983, abandoning the earlier finding of a "de facto merger" and substituting the "instrumentality doctrine" for piercing the corporate veil set out in ForestHill Corporation v. Latter Blum, 249 Ala. 23, 29 So.2d 298
(1947), as applied in Krivo Industrial Supply Co. v. NationalDistillers and Chemical Corporation, 483 F.2d 1098 (5th Cir. 1973), and Kwick Set Components v. Davidson Industrial, Inc.,411 So.2d 134 (Ala. 1982), again holding Matrix-Churchill liable. Springsteen, the plaintiff, and Matrix-Churchill, the cross-claimant, appealed from that order.
The liability vel non of a successor corporation has been explored previously by this Court, the applicable principles having been set forth in a recent decision, Rivers v. Stihl,Inc., 434 So.2d 766, 771 (Ala. 1983):
 "Liability of a successor corporation under corporation law is largely dependent on the form of the acquisition. When corporations merge, the successor remains liable for its predecessors' liabilities. Birmingham Trust National Bank v. State, 292 Ala. 335, 294 So.2d 153 (1974). This result is also obtained where, regardless of the denomination of the transaction by the parties, the acquisition constitutes a de facto merger. See Shannon v. Samuel Langston Co., 379 F. Supp. 797 (W.D.Mich. 1974). When, on the other hand, a corporation purchases the assets of another company the transferee is generally not liable unless (1) there is an express agreement to assume the obligations of the transferor, (2) the transaction amounts to a de facto merger or consolidation of the two companies, (3) the transaction is a fraudulent attempt to escape liability, or (4) the transferee corporation is a mere continuation of the transferor. 15 Fletcher, Cyclopedia Corporations § 7122 (Perm. ed. 1973); 19 Am.Jur.2d Corporations § 1546 (1965).
 "In the emerging field of products liability a separate body of law regarding the liability of successor corporations has begun to develop. See, e.g. Ramirez v. Amsted Industries, 86 N.J. 332, 431 A.2d 811 (1981); Ray v. Alad Corp., 19 Cal.3d 22, 136 Cal.Rptr. 574, 560 P.2d 3 (1977); `Products Liability — Liability of Transferee for Defective Products Manufactured by Transferor,' 30 Vand.L.Rev. 238 (1977). While recognizing that all of the policies underlying the rationales of other courts may not be applicable to the Alabama Extended Manufacturer's Liability Doctrine, this court adopted a `basic continuity of enterprise' test regarding the issue of transferee liability derived from Turner v. Bituminous Casualty Co., 397 Mich. 406, 244 N.W.2d 873 (1976), which contains an extensive analysis of the issues involved. See Andrews v. John E. Smith's Sons Co., 369 So.2d 781 (Ala. 1979). We ruled that a transferee may be held liable for its predecessor's liabilities `where the totality of the transaction demonstrates a basic continuity of the enterprise.' Andrews at 785."
In the present case, the trial court first found that there had been a de facto merger between "old" Cyril Bath and Matrix-Churchill, observing that "the management, and operations, of these two corporations were so interwoven that they were one in [sic] the same, and Cyril Bath was merely an instrumentality of Matrix-Churchill."
In making this finding, the trial court doubtless was applying the "basic continuity of enterprise" test adopted by the Court in Andrews v. John E. Smith's Sons Co.,369 So.2d 781, 785 (Ala. 1979), derived from Turner v. BituminousCasualty Co., 397 Mich. 406, 244 N.W.2d 873 (1976), which contains an extensive study of this aspect of products liability, including this quotation from Cyr v. B. Offen Co.,501 F.2d 1145 (1st Cir. 1974), at 1154:
 "`* * * The very existence of strict liability for manufacturers implies a basic judgment that the hazards of predicting *Page 787 
and insuring for risk from defective products are better borne by the manufacturer than the consumer. The manufacturer's successor, carrying over the experience and expertise of the manufacturer, is likewise in a better position than the consumer to gauge the risks and the costs of meeting them. The successor knows the product, is as able to calculate the risk of defects as the predecessor, is in position to insure therefor and reflect such cost in sale negotiations, and is the only entity capable of improving the quality of the product.
 "`. . . [I]t is true that the successor, by definition, was not the legal entity which launched the product on the stream of commerce or made an implied representation as to its safety. But in the most real sense it is profiting from an exploiting all of the accumulated good will [sic] which the products have earned, both in its outward representations of continuity and in its internal adherence to the same line of equipment.' . . ."
Turner, supra, added at 244 N.W.2d 882:
 "Where the successor corporation represents itself either affirmatively or, by omitting to do otherwise, as in effect a continuation of the original manufacturing enterprise, a strong indication of continuity is established. Justice would be offended if a corporation which holds itself out as a particular company for the purpose of sales, would not be estopped from denying that it is that company for the purpose of determining products liability. . . ."
That court ultimately adopted as guidelines for determining continuity of interest, and therefore responsibility, the first, third, and fourth criteria quoted in Shannon v. SamuelLangston Co., supra:
 "(1) There is a continuation of the enterprise of the seller corporation, so that there is a continuity of management, personnel, physical location, assets, and general business operations.
". . . .
 "(3) The seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible.
 "(4) The purchasing corporation assumes those liabilities and obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation."
Under these guidelines, was the trial court's finding of a defacto merger between "old" Cyril Bath and Matrix-Churchill supported by the facts?
Matrix-Churchill purchased 99.7% of Cyril Bath's common stock in 1969. James Kiggen, who was president and chief executive officer of the "old" Cyril Bath, also assumed those same positions with Matrix-Churchill following the purchase by Matrix-Churchill, and in fact operated both companies from the same office. Both companies had a common secretary-treasurer and comptroller, a common purchasing agent, and a common board of directors. Cyril Bath's operations continued in the same plant location as before, under Matrix-Churchill's substantial, though not complete, ownership. Thus, there was a continuation of "old" Cyril Bath's enterprise under the first criterion. Neither the second nor the third criterion was established, however. Quite the contrary, the record discloses that the "old" Cyril Bath's operations continued separately from those of Matrix-Churchill's operations after its purchase by the latter. It is not contended that "old" Cyril Bath ceased its operations and liquidated. In fact, it continued, albeit under joint management by Matrix-Churchill, until the sale to Fairfield.
In the continuation of "old" Cyril Bath's operations after its stock had been purchased by Matrix-Churchill, nothing is shown to justify the conclusion that Matrix-Churchill, the purchaser, assumed Cyril Bath's liabilities and obligations "ordinarily necessary for the uninterrupted continuation of ["old" Cyril Bath's] normal operations." Thus, the third component of a de facto merger was also missing.
Accordingly, there was no "continuity of enterprise" by Matrix-Churchill in its purchase *Page 788 
of Cyril Bath in 1969, under Andrews, supra, and Rivers, supra.
What is shown by the record is that Matrix-Churchill purchased 99.7% of "old" Cyril Bath's stock in 1969 and continued to operate it as a separate company. By purchasing substantially all of that stock, Matrix-Churchill did not effect a consolidation or merger which could be construed as an implied assumption of "old" Cyril Bath's obligations.
 "`[T]he test [of a "mere continuation"] is not the continuation of the business operation but the continuation of the corporate identity.' The indicia of `continuation' are a common identity of stock, directors, and stockholders and the existence of only one corporation at the completion of the transfer. . . ." (Emphasis added.) Travis v. Harris Corp., 565 F.2d 443, 447 (7th Cir. 1977).
The record clearly establishes that Matrix-Churchill and "old" Cyril Bath carried on distinct businesses. The former's business was importing and selling, and servicing, British-made machine tools used in cutting metals. "Old" Cyril Bath manufactured and serviced metal forming and stretch forming equipment, press brakes, and contracted for metal forming services. These two businesses maintained separate facilities, although they were located in the same building. Their sales and engineering departments were distinct, and each served different customers in different industries. "Old" Cyril Bath employed approximately 45 persons; Matrix-Churchill about 12. While their managements overlapped, that fact in itself does not establish resulting control by the successor. KrivoIndustrial Supply Co. v. National Distillers and ChemicalCorporations, supra. Finally, the record does not disclose any express agreement between Matrix-Churchill and "old" Cyril Bath whereby the former was to assume the obligations of "old" Cyril Bath, nor any facts justifying the conclusion that Matrix-Churchill's purchase of "old" Cyril Bath's stock was "a fraudulent attempt to escape liability." Quite the contrary, the press brake in question was manufactured by "old" Cyril Bath before the 1969 purchase of Cyril Bath stock by Matrix-Churchill, and plaintiff Springsteen was injured five years after "new" Cyril Bath acquired "old" Cyril Bath's operation. Neither those circumstances nor any others contained in the record allow any conclusion of fraud on the part of either Matrix-Churchill or "old" Cyril Bath.
Under these circumstances, the general rule applies to the questioned liability of Matrix-Churchill: the corporation purchasing the assets of another company generally is not liable. Rivers v. Stihl, Inc., supra, at 771. None of the exceptions to that rule can be applied to render Matrix-Churchill liable as "old" Cyril Bath's successor under the facts adduced.
We conclude, moreover, that the trial court's application of the "piercing the corporate veil" doctrine in order to impose potential liability upon Matrix-Churchill, likewise was erroneous. The facts of this case negate the conclusion that Matrix dominated and controlled "old" Cyril Bath to the extent that "old" Cyril Bath became the "mere instrumentality" of Matrix-Churchill so as to enable Matrix-Churchill to become a vehicle for evading responsibility. Krivo, supra; Forest HillCorp. v. Latter Blum, supra. The control required under the "instrumentality" rule amounts to "total domination of the subservient corporation ["old" Cyril Bath], to the extent that the subservient corporation manifests no separate corporate interests of its own and functions solely to achieve the purposes of the dominant corporation." Kwick Set Components,Inc. v. Davidson Industries, Inc., 411 So.2d 134 (Ala. 1982), quoting Krivo, supra, at 1107.
Nor is there any evidence that Matrix-Churchill itself, by its stock purchase or otherwise, caused Springsteen any harm or injury through misuse of any control. Krivo, supra.
 II. The Potential Liability of "New" Cyril Bath
In its second order, which found Matrix-Churchill responsible for any liability to *Page 789 
plaintiff under our products liability doctrine by virtue of "piercing the corporate veil," the trial court rejected the allegations of Matrix-Churchill by which the principle of estoppel was argued against "new" Cyril Bath:
 "Matrix-Churchill offers, in support of its motion, evidence of a listing by new Cyril Bath Company, Inc., in the Thomas Register for 1983 as a manufacturer of `press brakes.'
 "This evidence, along with the letter from new Cyril Bath offered by Matrix-Churchill as Exhibit 10 at trial, would likely have been sufficient for the Court to have applied the estoppel theory as set out in the John Smith's Sons case as to new Cyril Bath, if it had been properly before the Court at the time of trial."
As has been shown, neither the de facto merger theory nor the "[same] instrumentality doctrine" theory sustains the trial court's imposition of potential liability upon Matrix-Churchill. That portion of the trial court's second order discloses that the issue of estoppel was rejected by the trial court, because, in its opinion, evidence in support of an estoppel against "new" Cyril Bath was presented too late, i.e., on motion for a new trial. We disagree with that conclusion.
Matrix-Churchill's Exhibit 10 was introduced during trial. That exhibit is a letter written on letterhead stationery of "The Cyril Bath Company," dated August 26, 1976, after the purchase of "old" Cyril Bath by Fairfield, and sent to Clerkin Machinery Company of Indianapolis, Indiana. The letter contains a solicitation for business:
"Gentlemen:
 "The Cyril Bath Company was recently acquired by Fairfield Machine Company, Inc., of Columbiana, Ohio. Fairfield is a designer and builder of machinery for the steel industry with excellent engineering and fabrication experience. This new association has enabled us to make substantial cost improvements in our line of mechanical press brakes. Therefore, we are in a position to pass these savings along to our prospective customers. We are pleased to submit our new prices which we are certain will give you added impetus to promote and sell our line. Formerly you sold `Quality.' Now we have added the competitive price factor. We are certain that your sales efforts will result in many orders for Cyril Bath Press Brakes." (Emphasis added.)
The portions of the purchase agreement described earlier support the inference that "new" Cyril Bath not only contemplated using the Cyril Bath name, but had the seller agree to terms which prevented the seller from using that name and from competing in "the manufacture and sale of press brakes." It was also shown by the evidence that "new" Cyril Bath acquired from "old" Cyril Bath the right to manufacture press brakes. Matrix-Churchill and "old" Cyril Bath were obliged by the agreement to preserve the trade secrets and know-how; and the president of "old" Cyril Bath, James Kiggen, was by the terms of the agreement to be made available to the purchasing company "for no more than ten (10) working days within the first thirty (30) days following the closing."
Accordingly, there was evidence before the trial court, even without the listing referred to in the motion for a new trial, which made an issue of estoppel against "new" Cyril Bath. This is so because the evidence raises an inference that "new" Cyril Bath was intended by the purchaser to be a continuation of "old" Cyril Bath for the purpose of sales. As stated in Turner,supra, and adopted by this Court in Andrews, supra:
 "Where the successor corporation represents itself either affirmatively or, by omitting to do otherwise, as in effect a continuation of the original manufacturing enterprise, a strong indication of continuity is established. Justice would be offended if a corporation which holds itself out as a particular company for the purpose of sales, would not be estopped from denying that it is that company for the purpose of determining products liability. . . ." 244 N.W.2d at 882. *Page 790 
Accordingly, we have concluded that the trial court was incorrect when it did not consider the issue of estoppel under the evidence shown by the record. For that reason, the judgment must be reversed and the cause remanded for a new trial. It is so ordered.
REVERSED AND REMANDED.
TORBERT, C.J., and MADDOX, JONES and SHORES, JJ., concur.
[1] This company is referred to by the parties as "old" Cyril Bath because a "new" Cyril Bath came into being later, as the facts disclose.
[2] Then known as Matrix-Froriep.