Plaintiffs, Ardith Turner and the minor children of Kenneth Turner, deceased, appeal from a judgment based on a jury verdict in favor of defendants Insurers Services, Inc., Southern Risk Services, Inc., and Loopco Industries, Inc., and from a summary judgment in favor of defendants Wean Equipment Company and Wean United, Inc., in a wrongful death suit under the Alabama Extended Manufacturer's Liability Doctrine. This appeal concerns only whether Wean United is a mere continuation of Wean Equipment and whether the court improperly excluded certain hearsay testimony offered during the jury trial.
Kenneth Turner was fatally injured while operating a "general duty slitting line machine" for Hanna Steel Company in Birmingham. On August 2, 1982, Ardith Turner, "as dependent widow of Kenneth Turner, deceased,"[1] along with Kenneth Turner's two minor children, filed suit against the above-named defendants (for simplicity we shall refer simply to Ardith Turner as plaintiff). Wean Equipment Company was sued as the manufacturer of the machine and Wean United was sued as the successor in interest to Wean Equipment. In an order dated May 9, 1986, the circuit judge granted summary judgment in favor of both of these defendants. The jury trial against the remaining defendants began on September 8, 1986, and a verdict in favor of those defendants was rendered on September 16. The trial court denied motions for JNOV and new trial, entered judgment, and Turner appealed.
Although the history surrounding the slitting machine in this case is complex, the circuit judge did an admirable job of explaining it in his May 9 order granting summary judgment to Wean Equipment and Wean United. Judge Cherner related the facts as follows:
 "For several years prior to 1961, Wean Engineering of Warren, Ohio, and Wean Equipment of Euclid, Ohio, operated related but apparently independent businesses. Wean Equipment manufactured metal processing machinery, including general duty slitting lines such as the one involved in Turner's accident. Wean Engineering also engaged in development and manufacture of similar machinery. Wean Engineering did not have a manufacturing facility. Instead, Wean Engineering subcontracted the manufacture of the machines it sold and designed to several companies, including Wean Equipment. At the time of the transaction, both corporations were closely held and operated by the Wean family. R.J. Wean, Jr. was the president and chief executive officer of Wean Equipment and vice president and director of Wean Engineering.
 "According to the Minutes of the Board of Directors' meeting of Wean Equipment for May 9, 1961, R.J. Wean, Jr., informed the corporation that: *Page 829 
 "`Because of all the difficulties that had been encountered by the company with the Wean press, the suit of American Can Company, and the claims of Continental Can Company, Reynolds Metal, Lafayette Aluminum, Dravo, and others, it has been impossible and it appears that it will be impossible for the company to obtain sufficient business to operate its manufacturing facilities at a profit.'
"Accordingly, the Minutes continue:
 "`He [R.J. Wean, Jr.] further stated that he had been giving careful thought as to how the company might realize something on its designs, drawings, patents and other technical information, and had discussed the matter with the Wean Engineering Company, Inc., for the purpose of making arrangements for the manufacture and sale by it of this company's products, particularly to the basic steel industry and the nonferrous and metal container industries, and for the manufacture of this company's products by the McKay Machine Company for sale, particularly to the metal working industry for the processing of flat steel products; that it is his proposal that the Wean Engineering Company, Inc., purchase this company's designs, drawings, patents and other technical information by paying therefor over a period of years a purchase fee in an amount equal to a fair percentage of the net sales price at which the Wean Engineering Company, Inc., and the McKay Machine Company should sell this company's products. . . .'
 "Subsequently, by Purchase Agreement effective July 10, 1961, Wean Equipment transferred to Wean Engineering: `Patents and patent applications . . . and written technical data (including blueprints, drawings, manufacturing routings, specifications, measurements, bills of material, metallurgical data, cost estimates, performance and operational statistics, and other written technical information) covering or relating to first party's products. . . .'
 "In a section of the agreement entitled, `Exploitation of the Property,' Wean Engineering resolved to license the McKay Machine Company of Youngstown, Ohio, of which the Wean family owned 27% of the stock, to manufacture and sell the Wean Equipment property. By License Agreement of July 10, 1961, Wean Engineering transferred the right, exercise and privilege to sell, manufacture and use the property it had acquired pursuant to the Purchase Agreement to McKay. Thereafter, the old Wean Equipment line of machinery was manufactured in the McKay name and at the McKay facility. [Emphasis added.]
 "The Purchase Agreement also expressly gave Wean Engineering the power to grant additional licenses as it deemed desirable. Wean Engineering agreed to use its `best efforts' to maintain a demand for the Wean Equipment products and `observe the minimum standards of quality' established by Wean Equipment.
 "Payment for the purchase was to be on an installment basis based upon a percentage of the net sales price of the first party's products thereafter sold. Wean Equipment's real property, buildings and other fixed assets were sold to unrelated third parties, and then in 1964, Wean Equipment officially dissolved.
 "In 1966, Wean Engineering Company, then Wean Industries, merged with the McKay Machine Company, the licensee under the Wean Equipment purchase agreement, to become Wean United, Inc., the entity named in this lawsuit."
After the rendition of pertinent facts, the circuit judge concluded that neither Wean Equipment nor Wean United could be sued as manufacturer of the machine. The circuit judge applied the guidelines from Turner v. Bituminous Casualty Co.,397 Mich. 406, 244 N.W.2d 873 (1976), as applied in Rivers v.Stihl, Inc., 434 So.2d 766 (Ala. 1983), and Matrix-Churchill v.Springsteen, 461 So.2d 782 (Ala. 1984), to conclude that Wean United was not the successor in interest to Wean Equipment and could not, therefore, be held liable for the machine's manufacture. *Page 830 
The factors considered by the Michigan Supreme Court inTurner were:
 "1) There was basic continuity of the enterprise of the seller corporation, including, apparently, a retention of key personnel, assets, general business operations and even the [seller's] name.
 "2) The seller corporation ceased ordinary business operations, liquidated, and dissolved soon after distribution of consideration received from the buying corporation.
 "3) The purchasing corporation assumed those liabilities and obligations of the seller ordinarily necessary for the continuation of the normal business operations of the seller corporation.
 "4) The purchasing corporation held itself out to the world as the effective continuation of the seller corporation."
Turner, 397 Mich. at 430, 244 N.W.2d at 883-84.
The rule regarding liability imposed upon a corporate successor in interest for defective products manufactured by its predecessor was applied in Andrews v. John E. Smith's SonsCo., 369 So.2d 781, 785 (Ala. 1979):
 "As a general rule, where one company sells or otherwise transfers all its assets to another company, the transferee is not liable for the debts and liabilities of the transferor unless (1) there is an express agreement to assume the obligations of the transferor, (2) the transaction amounts to a de facto merger or consolidation of the two companies, (3) the transaction is a fraudulent attempt to escape liability, or (4) the transferee corporation is a mere continuation of the transferor. 15 Fletcher, Cyclopedia Corporations § 7122 (Perm. ed. 1973); 19 Am.Jur.2d § 1546."
In Andrews, the Court said, "Justice would be offended if a corporation which holds itself out as a particular company for the purpose of sales, would not be estopped from denying that it is that company for the purpose of determining products liability."
In Rivers v. Stihl, Inc., 434 So.2d 766 (Ala. 1983), the Court applied the "basic continuity of enterprise test" fromTurner and Andrews, supra. In concluding that there was a basic continuity of enterprise between Stihl and its predecessor, the Court looked to the following factors. First, the successor acquired all of the predecessor's assets in the division that distributed Stihl products in America. Second, the successor corporation acquired the contract rights of the predecessor and exclusive rights to use the trade name in this country. Third, the successor expressly assumed liability for damages in products liability actions arising out of sales of Stihl products by the predecessor. Fourth, although the successor did not use the predecessor's plant and employees, the same products were being manufactured by the same company and were distributed in the same market under the same trade name. The Court went on to reverse the summary judgment granted to Stihl, Inc., concluding that, as successor, it should be estopped to deny liability for injuries caused by a chain saw sold by the predecessor company. 434 So.2d at 772.
Citing both Andrews and Turner v. Bituminous Casualty Co., Turner claims that the sale of assets to Wean Engineering, which later became Wean United, demonstrated a basic continuity of enterprise.[2] The circuit court applied the Turner guidelines in its opinion and concluded that Wean United could not be held liable for injuries caused by a product manufactured by Wean Equipment. After reviewing the record, we agree with the court below that the "continuity of enterprise" test was not met in the present case.
The first factor of the continuity of enterprise test, and arguably the most important, is whether there is a basic continuity of the seller corporation, a retention of key personnel, assets, and operations. The circuit judge said in this regard: *Page 831 
 "Many of the indications of such continuity of the enterprise are not present in this case. The Wean Equipment product was not manufactured at the same location subsequent to the transfer. Although a few key personnel were retained, many employees did not continue with the successor. Notably, the purchase agreement between Wean Equipment and [Wean United] governed the transfer of only the `patents, patent applications, drawings and other technical property, together with the salability of the machinery and equipment that can be manufactured thereunder,' in the language of the June 16, 1961, Wean Equipment Minutes. Essentially all the other assets of Wean Equipment were transferred to third parties.
 "The question is whether there was a `basic continuity of the enterprise.' Here, the facility, personnel and essentially all aspects of the manufacturing process were changed coincident to the purchase agreement. On the other hand, the technical data and right to sell Wean Equipment's products were transferred to [Wean United]."
Turner's argument is that a basic continuity of enterprise existed because the Wean family controlled both corporations. She contends that licensing McKay Machine Company to manufacture the product amounted to a continuity of operations in spite of the fact that production was under the McKay trade name. It is notable, in this regard, that the product was not manufactured at the same location or by the same work force. It also appears from the record that the assets of Wean Equipment that were not sold to Wean United were sold to third parties during the three-year winding down period. The mere fact that the Wean family owned shares in both companies is not a sufficient basis to find a continuity of enterprise in the present case. See Matrix-Churchill, supra. Because production was in a different location, under a different trade name, and by a different work force, this Court agrees with the circuit judge that there was no "basic continuity of enterprise" here.
The second factor of the continuity of enterprise test is whether the selling corporation dissolves shortly after the transfer of assets. The trial court found that Wean Equipment ceased its ordinary business operations after the sale of assets to Wean United. Although Wean Equipment did not officially dissolve until almost three years after the sale, the trial court attributed the activity in the interim to winding down and liquidation of remaining assets. This finding is not contested on appeal, and this Court adopts the reasoning of the court below.
The third factor to be considered is whether Wean United expressly assumed the liabilities of Wean Equipment. Turner concedes in her brief that there is no express assumption of liabilities in this case but asserts that Wean United's agreement to use its best efforts to expand the demand for the products and to observe minimum standards in their production, somehow implied an assumption of liabilities. Turner's argument is that an express assumption of liabilities is not required, "Because," she says, "the purchase agreement was effectuated to cloak the Wean family and Wean United" from civil liability.
This Court finds this argument wholly speculative and unsupported by any evidence. The motives behind the sale of assets in 1961 are not relevant to the question of whether there was an express assumption of liability for damages in products liability actions. An assumption of liability would be a strong indicator of continuity of enterprise, and its absence here tends to indicate the contrary. See Rivers v. Stihl Inc.,434 So.2d 766 (Ala. 1983), and Matrix-Churchill v. Springsteen,461 So.2d 782 (Ala. 1984).
The final factor of the continuity of enterprise test, as explained in Turner, is whether the purchasing corporation held itself out to the world as the effective continuation of the seller corporation. The circuit court correctly pointed out that the products sold by Wean United, the corporation that acquired the assets, were manufactured at a different facility and under the McKay name. Because the products *Page 832 
were marketed under a new name, and because Wean United did not attempt to avail itself of the benefit of the old company name, it cannot be considered to have held itself out as the same company as Wean Equipment. Turner argues that the facts that the Wean family controlled Wean Equipment and Wean United and that Wean United had a partial interest in McKay, are sufficient to show continuity. Although a finding of control by the same shareholders in both the acquiring company and the selling company is relevant for purposes of piercing the corporate veil or finding a de facto merger, it is not relevant to the question of continuity of enterprise. SeeMatrix-Churchill v. Springsteen, 461 So.2d 782 (Ala. 1984). Because the product line in question was sold under the McKay trade name, the trial court was correct in concluding that Wean United did not hold itself out as the same entity as Wean Equipment.
For the above-stated reasons, this Court concludes that Wean United is not estopped to deny liability for a product manufactured by Wean Equipment. Likewise, because Wean Equipment officially dissolved in 1964, it cannot be a party to the lawsuit. See Ala. Code 1975, § 10-2A-203. Thus the court did not err in granting summary judgment to Wean Equipment and Wean United.
The other issue raised by Turner is whether the trial court abused its discretion in excluding certain testimony proffered by her in the trial against the remaining defendants. The following testimony was elicited by the appellant's lawyer in camera:
 "Question: Ardith, before the, the night before Kenneth was killed on Thursday evening, did you have a conversation with him?
"Turner: Yes, sir, I did.
 "Question: And tell us, if you would, and tell the court what that conversation was?
 "Turner: When he would come in, he was really upset. He had told me that he didn't like the machine he had been working on, and that he was afraid of the machine he was working on. And they told him if he didn't quit griping about it, that they would give him a pink slip, and I took that [sic] being fired.
 "Question: And do you know what machine he was talking about?
"Turner: The slitter, the one that he was on."
Turner offered the above to contradict the assertion by the defense[3] that there was in effect an "open door" safety program at Hanna Steel. Although Turner admits that this is hearsay, she contends "that the necessity, trustworthiness, and probative value of the proffered testimony outweigh the prejudicial effects of its admissibility as hearsay."
The Court defined "hearsay" in Alabama Power Co. v. Harmon,483 So.2d 386, 390 (Ala. 1986), "as evidence of an out-of-court statement offered to show the truth of the matter asserted."Lavett v. Lavett, 414 So.2d 907 (Ala. 1982). See also Cleary,McCormick on Evidence, § 246, p. 729 (3d ed. 1984); see 5 Wigmore, Evidence § 1361 (Chadbourne Rev. 1974); Gamble,McElroy's Alabama Evidence, § 241.01, et seq. (3d ed. 1977).
In reviewing the trial court's exclusion of the above-quoted material from the jury, this Court will not reverse absent evidence of gross abuse of discretion. Russellville FlowerCraft, Inc. v. Searcy, 452 So.2d 478 (Ala. 1984); Dorcal, Inc.v. Xerox, 398 So.2d 665 (Ala. 1981). Although such testimony would certainly refute the existence of an "open door" policy at Hanna, the trial court did not abuse its discretion in excluding it. Mrs. Turner's relating the content of conversations with her husband *Page 833 
the night before his death is the very sort of evidence the hearsay rule is designed to exclude. By its very nature, it rests on the credibility of the out-of-court asserter, Mr. Turner. "It has been said that the principal purpose of the constitutional right of an accused to be confronted with the witness against him is to afford him the opportunity to cross-examine such witness." C. Gamble, McElroy's AlabamaEvidence, § 242.01 (2), at 511 (3d ed. 1977). Because this testimony, by its nature, prevents cross-examination of the witness, it was properly excluded by the trial court. No issue was raised regarding the application of the Dead Man's Statute. See Ala. Code 1975, § 12-21-163.
For the above-stated reasons the judgment of the circuit court is due to be, and it is hereby, affirmed.
AFFIRMED.
TORBERT, C.J., and MADDOX, BEATTY and HOUSTON, JJ., concur.
[1] No issue is made regarding the right of Ardith Turner to sue in the described capacity. See Ala. Code 1975, § 6-5-410.
[2] For the sake of clarity, this Court shall refer to the acquiring company as "Wean United" throughout this opinion.
[3] Insurers Services and Southern Risk were sued for negligent inspection; Loopco was sued under the AEMLD and for failure to warn. They presented evidence to show that Hanna Steel had an ongoing safety program and an effective system for addressing employee complaints, and argued that, by ascertaining that these programs were in place, they fulfilled any duty they may have had.