989 So.2d 513 (2008)
PARRETT TRUCKING, INC.
v.
TELECOM SOLUTIONS, INC.
Parrett Trucking, LLC
v.
Telecom Solutions, Inc.
1061528 and 1061618.
Supreme Court of Alabama.
February 15, 2008.
*514 Paul A. Clark of Balch & Bingham, LLP, Montgomery, for appellants.
Scott Anderson, Decatur; and Donald A. Chapman, Decatur, for appellee.
*515 STUART, Justice.
Parrett Trucking, Inc. ("PTI"), and Parrett Trucking, LLC ("PTL"), the purchaser of PTI's assets, appeal from the judgment of the trial court holding that PTI breached its contract with Telecom Solutions, Inc. ("TSI"), and holding PTI and PTL, as the corporate successor to PTI, liable for damages resulting from that breach. PTI argues that there was no breach of contract, and PTL argues that TSI failed to establish that it was the corporate successor to PTI and thus liable for any breach. We affirm the judgment as to PTI (case no. 1061528) and reverse it as to PTL (case no. 1061618).

I. Factual and Procedural Background

On January 29, 2003, PTI, a Scottsboro-based trucking company, entered into a consulting agreement with TSI, pursuant to which TSI would assist PTI in lowering the costs of its telecommunications services. TSI was to accomplish this by analyzing PTI's past invoices and then: 1) securing refunds and/or credits for past overcharges and 2) identifying options to reduce future telecommunications expenses. In return, PTI was to remit to TSI: 1) 50% of the value of all credits and refunds received for past overcharges, and 2) 50% of the "total amount saved during the first twenty-four full months following the implementation of new programs or other changes to [PTI]'s telecommunication arrangements." Among the terms and conditions included in the consulting agreement were the following:
 "[Client shall] [b]e assessed consultant's fees if any telecom cost saving services are implemented any time during the first 24 months from the date TSI's recommendation report has been rendered."
 "[Client shall] [r]emit consulting fees to consultant according to `Schedule A' herein, after reviewing for accuracy with consultant. Consultant receives a fee only if the client receives a positive benefit from cost saving services."
 "Fees for cost reductions will be derived from the actual invoice after changes have been implemented. Savings will be based on an average of the old telecom phone bill vs. new cost for each individual item, based on the invoices analyzed by consultant."
 "At one month intervals, consultant shall calculate the actual savings and collect a fee of 50% of the actual savings on those items implemented by consultant or client."
 "The client understands consultant has been granted exclusive right to act as the telecommunications auditing department for the term of the agreement. The client will consult with consultant before making any moves, additions, or changes, if time allows. Failure to do so does not preclude any compensation set forth in this agreement."
 "Fees are due and payable for all implemented changes made by the consultant, by the client, or by the client's telecom vendors, whether implemented by the consultant, by the client, or by the vendor on any telecom related items implemented within 24 months of the date consultant provides a `recommendation report' but no sooner than 24 months from the date first set forth below. If client declines to carry out proposed cost savings recommendations by consultant, then client must do so in writing. If, within 2 years of the date of the written notice presented to consultant, the client performs the recommended changes or a portion thereof, then the client is subject to the consultant's compensation arrangement described above."

*516  "Should the client fail to comply with any part of this agreement or pay any fee or part thereof when due:
"1) Will result in client being charged fees as determined by initial cost estimate comparison or from the last previous check up (whichever is available) through the remainder of the term of this agreement. Payment is due immediately.
"2) If payment is not received and when litigation is necessary, consultant is entitled to recover all costs associated with that action, including but not limited to, reasonable attorney's fees and 1.5% interest per month, if and only if client is found liable for consultant's fees. Client waives venue to the courts of Morgan County, Alabama."
After entering into the consulting agreement with PTI, TSI spent approximately a year working on the PTI account, reviewing past billing statements, seeking refunds, and then modifying services and changing service providers. It was not until February 17, 2004, that TSI submitted its first invoice to PTI. That invoice indicated that TSI had obtained $12,651.56 in refunds and credits from service providers as compensation for past overcharging of PTI's account, and that PTI had saved $4,113.56 on its local and long-distance telephone service the previous month because of changes implemented by TSI.[1] Pursuant to the terms of the consulting agreement, PTI paid TSI 50% of both figures, $6,325.78 and $2,056.78, respectively, for its work. Using billing statements forwarded to it by PTI, TSI calculated PTI's monthly savings in March, April, and May 2004 as well. Upon receiving TSI's invoices for those months, PTI promptly paid TSI 50% of the amount saved.
On May 17, 2004, PTI entered into an asset-purchase agreement with PTL, an Arkansas limited-liability company previously known as Classic Leasing LLC. PTL was a wholly owned subsidiary of Maverick Transportation, Inc. Pursuant to the terms of the asset-purchase agreement, PTL acquired virtually all PTI's assets.[2] PTL also assumed some obligations and liabilities of PTI; however, it disclaimed all obligations that were not specifically assumed under the terms of the asset-purchase agreement. PTI's consulting agreement with TSI was not listed as one of the liabilities that PTL assumed.
PTI immediately ceased operating its trucking business after the asset sale; it voluntarily gave up the licenses and permits that it held, and it canceled its insurance. However, although PTI was no longer operating as a licensed motor carrier, business continued as usual at the PTI facilities and for PTI employees; PTL merely took over the operations. PTL continued to operate out of the same location and used the same telephone number, Web site, personnel, assets, and equipment that PTI had used.
After the asset sale, PTI took the position with TSI that it no longer had any telecommunications systems or services (having all been transferred to PTL) and *517 that PTI was accordingly not receiving any monthly savings as a result of TSI's services. Therefore, it made no payments to TSI for any savings that would have been achieved after May 17, 2004.
On June 1, 2005, TSI sued PTI in the Morgan Circuit Court, alleging breach of contract. PTL and Maverick Transportation were also named as defendants under a theory of successor-corporation liability. A bench trial was held on March 5, 2007. At the close of TSI's case-in-chief, the trial court entered a judgment as a matter of law for Maverick Transportation. On March 8, 2007, the trial court entered a judgment in favor of TSI and against PTI and PTL in the amount of $111,060.84, plus court costs. PTI and PTL jointly moved for a new trial; however, after a hearing, the trial court denied their motion. They then filed separate appeals to this Court, which were subsequently consolidated for purposes of writing one opinion. PTI and PTL raise three issues on appeal.

II. PTI's Appeal (case no. 1061528)

A.
PTI first argues that under the unambiguous terms of the consulting agreement, it owed TSI a monthly fee only if, during a specific month, PTI received "a positive benefit" from TSI's services as evidenced by "actual savings" in telecommunications expenses because of TSI's recommendations. PTI argues that it did not have any such savings after the May 17, 2004, sale of its assets because, it argued, it no longer had any telecommunications expenses; therefore, PTI argues, it owed TSI no additional fees after that date.
As PTI notes, there has been no allegation or finding that the consulting agreement is ambiguous. Thus, even though the trial court conducted a bench trial and received evidence ore tenus, we apply the standard of review set forth by this Court in Winkleblack v. Murphy, 811 So.2d 521, 525-26 (Ala.2001), and we review this first issue de novo:
"As long as the contractual terms are clear and unambiguous, questions of their legal effect are questions of law. Commercial Credit Corp. v. Leggett, 744 So.2d 890 (Ala.1999). Thus, we apply a de novo review to a trial court's determination of whether a contract is ambiguous and to a trial court's determination of the legal effect of an unambiguous contract term."
PTI's argument that it did not breach the consulting agreement is based on the following two provisions in the consulting agreement: that the "[c]onsultant receives a fee only if the client receives a positive benefit from cost saving services" and that the "consultant shall calculate the actual savings and collect a fee of 50% of the actual savings on those items implemented by consultant or client" (emphasis added). PTI argues that it received no "positive benefit" or "actual savings" from the changes implemented by TSI after May 17 because it had no telecommunications services and received no statements for telecommunications services after that date. However, although this argument may at first blush appear persuasive, it fails to recognize another provision in the consulting agreement, which states:
"The client understands consultant has been granted exclusive right to act as the telecommunications auditing department for the term of the agreement. The client will consult with consultant before making any moves, additions, or changes, if time allows. Failure to do so does not preclude any compensation set forth in this agreement."
The trial court, in its March 8, 2007, order, held that PTI did not comply with this provision and that it accordingly breached *518 its contract with TSI by selling its assets, including its telecommunications systems, to PTL without first consulting TSI:
"The consult[ing] agreement provided that unless [PTI] declined in writing the recommendations submitted by [TSI] in February 2003, then the latter would be paid a fee, calculated monthly on actual cost savings resulting from the recommended telecommunications system and service changes, for a period of 24 months from the date of [TSI]'s detailed analysis and recommendation report. Under the terms of the consult[ing] agreement and letter of agency, [PTI] granted [TSI] the exclusive right to act as its telecommunications auditor and agent, agreed to consult with [TSI] before making any changes to its telecommunications systems or services and agreed that any such changes made by it without consulting [TSI] would not preclude [TSI's] receipt of the compensation called for in the consult[ing] agreement. In short, [PTI] had no unilateral right to terminate the consult[ing] agreement by selling its assets to [PTL,] who then chose to implement a whole new telecommunications system without consulting [TSI]."[3]
PTI now argues that there was no provision in the consulting agreement specifically preventing it from entering into an asset-purchase agreement; however, that argument is immaterial. There undoubtedly was a provision barring PTI from "making any moves, additions, or changes" to its telecommunications systems without first consulting with TSI. PTI failed to comply with that provision and, under the clear language of the consulting agreement, that failure "does not preclude any compensation set forth in this agreement." Accordingly, the trial court correctly held that PTI breached its contract with TSI.

B.
PTI argues that, assuming there was a breach, the trial court erred by awarding TSI damages based on cost savings achieved in connection with PTI's cellular-telephone service as a result of TSI's recommendations. "The ore tenus standard of review extends to the trial court's assessment of damages." Edwards v. Valentine, 926 So.2d 315, 325 (Ala.2005). Thus, the trial court's damages award will be reversed "only if clearly and palpably erroneous." Robinson v. Morse, 352 So.2d 1355, 1357 (Ala.1977). PTI argues that although TSI made several cost-savings recommendations for adjusting PTI's cellular-telephone service, there was no evidence indicating that PTI ever implemented any of those recommendations. Moreover, they note that TSI calculated the alleged "actual savings" that would have resulted from PTI's implementing those recommendations by comparing PTI's old cellular-service bills with the post-asset-sale cellular-service bills of PTL. Thus, they conclude, the damages awarded on the basis of savings allegedly received for cellular service are impermissibly based on speculative evidence. See generally Systrends, Inc. v. Group 8760, LLC, 959 So.2d 1052, 1075-76 (Ala.2006) (noting that "`[d]amages may not be based upon speculation'" (quoting Jamison, Money, Farmer & Co. v. Standeffer, 678 So.2d 1061, 1067 (Ala.1996))).
At trial, TSI's president, David Hendriks, testified that he made the following recommendations to PTI regarding ways it could reduce its monthly cellular-telephone expenses: (1) "cancel the service if it's not needed"; (2) "switch to a lower cost plan"; *519 and (3) "get the corporate discount." He further testified that he in fact got an 8% discount with Verizon, a cellular-service provider, on behalf of PTI. A written analysis of PTI's cellular service prepared by TSI also recommended that PTI cancel all lines of cellular service with the cellular-service providers Nextel and Suncom/Tritel and use Verizon exclusively. PTI does not dispute that TSI made these recommendations; however, it argues that there is no evidence indicating that it ever adopted them and realized "actual savings" as a result. Again, however, PTI fails to recognize the effect of the provision in the consulting agreement stating that "[t]he client will consult with consultant before making any moves, additions, or changes, if time allows. Failure to do so does not preclude any compensation set forth in this agreement." PTI's failure to consult with TSI before selling its assets accordingly cannot deprive TSI of compensation it would have otherwise been due.
The consulting agreement provided that "[i]f client declines to carry out proposed cost savings recommendations by consultant, then client must do so in writing." There is no evidence indicating that PTI ever notified TSI in writing that it was declining to carry out TSI's cellular-telephone-service cost-saving recommendations. Therefore, we may presume that those recommendations would have been implemented if not for PTI's breach of contract and that TSI would have been entitled to its fee as a result of the savings achieved.
Having established that TSI was entitled to a fee based on cellular-service cost savings, we must still consider the argument that the damages award was based on mere speculation. TSI was able to establish damages based on the fees it earned by reducing local- and long-distance-telephone-service expenses by simply comparing PTI's telecommunications bills before and after TSI's recommendations were implemented; however, it was unable to use this same process with PTI's cellular service because PTI sold its assets before all TSI's recommendations were implemented. TSI accordingly compared PTI's pre-asset sale cellular-telephone bills with PTL's cellular-telephone bill after the asset sale.[4] It appears that during the interval between the sale of its assets in May 2004 and September or October 2004whether by coincidence or pursuant to the recommendation made by TSI PTL canceled approximately 40 of the 51 lines of cellular service that PTI had formerly had, and its expenses were reduced accordingly. The damages awarded by the trial court were presumably based on the evidence indicating those savings and were, therefore, not based on mere speculation.

III. PTL's Appeal (case no. 1061618)
PTL argues that TSI failed to establish that PTL was responsible for PTI's debts under a theory of successor liability. The trial court applied the continuity-of-enterprise test and concluded that PTL was merely the continuation of PTI and was, therefore, liable for PTI's debts. This Court explained the continuity-of-enterprise test in Asher v. KCS International, Inc., 659 So.2d 598, 599-600 (Ala.1995), as follows:
"This court has adopted a four-factor test for determining whether a purchasing corporation is a mere continuation of the selling corporation. If there is substantial *520 evidence of each of the four factors, then [the purchasing corporation] may be held liable as a successor corporation. Brown v. Economy Baler Co., 599 So.2d 1 (Ala.1992). The factors are as follows:
"`"(1) There was basic continuity of the enterprise of the seller corporation, including, apparently, a retention of key personnel, assets, general business operations and even the [seller's] name.
"`"(2) The seller corporation ceased ordinary business operations, liquidated, and dissolved soon after distribution of consideration received from the buying corporation.
"`"(3) The purchasing corporation assumed those liabilities and obligations of the seller ordinarily necessary for the continuation of the normal business operations of the seller corporation.
"`"(4) The purchasing corporation held itself out to the world as the effective continuation of the seller corporation."'
"Id. at 3, quoting Turner v. Bituminous Casualty Co., 397 Mich. 406, 244 N.W.2d 873, 883-84 (1976), as quoted in Turner v. Wean United, Inc., 531 So.2d 827, 830 (Ala.1988). See, also Pietz v. Orthopedic Equipment Co., 562 So.2d 152 (Ala. 1989)."
PTL now argues that the trial court's findings as to the second and third factors, i.e., that PTI was dissolved and that PTL had assumed those liabilities and obligations of PTI necessary for the continuation of PTI's normal business operations, are unsupported by the evidence and therefore clearly erroneous. See Odom v. Hull, 658 So.2d 442, 444 (Ala.1995) ("Where ore tenus evidence is presented to the trial court, a presumption of correctness exists as to the court's findings on issues of fact; its judgment based on these findings of fact will not be disturbed unless it is clearly erroneous, without supporting evidence, manifestly unjust, or against the great weight of the evidence.").
We first consider PTL's argument that TSI failed to present substantial evidence establishing the second factorthat PTI "ceased ordinary business operations, liquidated, and dissolved soon after distribution of consideration received from the buying corporation." Asher, 659 So.2d at 599. PTL does not dispute that PTI may have ceased doing business and/or liquidated; however, it argues that there was no evidence indicating that PTI had dissolved at any time, much less "soon after distribution of consideration received from the buying corporation." Asher, 659 So.2d at 599. At trial, the only evidence offered that related to the dissolution of PTI was the testimony of Michael Parrett, its owner and president. He testified as follows under direct examination:
"Q: Now, as we sit in this courtroom today, [PTI] is still a viable corporation, isn't that right? Let me ask this question: `It still has assets, doesn't it?'
"A: [PTI]? I don't believe so.
"Q: Does it pay taxes?
"A: No, there's no taxes to be paid.
"Q: Does it make Secretary of State filings?
"A: It's had to do that, yes.
"Q: Because it is still on paper a corporation, correct?
"A: I believe that's accurate, but I'm not sure of that. I know we're in the process of it not being, and I don't know if that's transpired or not.
"Q: I see. So let me be fair about this. After May 17, on May 18, 2004, all right, May 18, the day after the asset *521 purchase, on May 18, [PTI] still had assets?
"A: That's correct.
"Q: On May 18, 2004, [PTI] still paid taxes?
"A: That's correct.
"Q: On May 18, 2004, [PTI] still made Secretary of Statefilings with the Alabama Secretary of State's office?
"A: That's correct.
"Q: And it has been a process since that time up until today of [PTI] winding down, is that correct?
"A: That's correct.
"Q: And as we sit here today, you're unsure one way or the other if [PTI] is still a viable corporation, but you believe that [PTI] still exists on paper, correct?
"A: As far as I know."
Under subsequent questioning by TSI's attorney, Parrett again confirmed that he did not know the legal status of PTI:
"Q: But you're in the process of seeing to it that [PTI]'s not in existence?
"A: I don't know where we are in that process.
"Q: But you're in that process? That's my question.
"A: Somewhere.
"Q: Okay.
"A: But it may already be done. I'm not sure.
"Q: I understand. I'm not trying to pin you down to that. But you're somewhere in that legal process?
"A: Somewhere."
Thus, Parrett testified that at the time of his testimony he believed PTI was technically still a corporation, but that it was somewhere in the process of dissolving. This is not evidence indicating that PTI is dissolved. In Asher, we emphasized that the continuity-of-enterprise test requires evidence of the seller corporation's actual dissolution, stating:
"Although Cruistar [the seller corporation] dissolved the Cruisers division of the corporation, Cruistar the corporation did not dissolve. The [appellants] argue that the real intent of that requirement is that all the predecessor's ordinary business must have ceased. However, the rule provides that the corporation must `cease[] ordinary business operations, liquidate[], and dissolve[].' Indisputably, this has not occurred with Cruistar. See Matrix-Churchill v. Springsteen, 461 So.2d 782 (Ala.1984) (holding that even though the purchasing corporation acquired 99.7% of the old stock and continued to operate the purchased corporation as a separate entity, the requirement that the old corporation `cease ordinary business operations, liquidate and dissolve' was not met, because the selling corporation did not completely dissolve)."
659 So.2d at 600. That PTI is "for all practical purposes dissolved," as TSI states in its brief, or "effectively dissolved," as the trial court found in its order, is insufficient. There must be evidence of dissolution.
The trial court buttressed its conclusion by citing Turner v. Wean United, Inc., 531 So.2d 827 (Ala. 1988), in which this Court affirmed the trial court's judgment based on its finding that the second factor of the continuity-of-enterprise test was met even though the evidence established that the seller corporation was not officially dissolved until three years after the asset sale, for the proposition that, "within the entire scheme of the continuity-of-enterprise test, factor (2) does not carry great weight." However, under the continuity-of-enterprise test adopted by this Court, there is no "weighing" of the factors; rather, as we stated in Asher, there must be *522 "substantial evidence of each of the four factors." 659 So.2d at 599.[5] Thus, although Turner may support the proposition that there is some room for discretion in determining whether a dissolution took place "soon after" an asset sale, it in no way abrogated the requirement that there be substantial evidence of dissolution. In Turner, there was evidence establishing proof of dissolution; in the present case, there was no such evidence. For that reason, the trial court's finding that PTI was dissolved is clearly erroneous. Because PTI was not dissolved, PTL cannot be held liable as a successor corporation to PTI based on the continuity-of-enterprise theory, and the trial court's judgment must be reversed in that regard.[6]
Before closing, however, we must also address the trial court's observation, and TSI's associated argument on appeal, that there would be "something unsavory" about a finding that PTI was not dissolved in light of the fact that the asset-purchase agreement between PTI and PTL allegedly contained a barrier to the dissolution of PTI; specifically, a provision that prevented PTI from dissolving, distributing, or liquidating its assets "unless the procedure set forth in § 10-2B-14.06, Ala.Code 1975, is followed with respect to known claims against [PTI]." Section 10-2B-14.06 provides:
"(a) A dissolved corporation may dispose of the known claims against it by following the procedure described in this section.
"(b) The dissolved corporation shall notify its known claimants in writing of the dissolution at any time after its effective date. The written notice must:
"(1) Describe information that must be included in a claim;
"(2) Provide a mailing address where a claim may be sent;
"(3) State the deadline, which may not be fewer than 120 days from the effective date of the written notice, by which the dissolved corporation must receive the claim; and
"(4) State that the claim will be barred if not received by the deadline.
"(c) A claim against the dissolved corporation is barred:
"(1) If a claimant who was given written notice under subsection (b) does not deliver the claim to the dissolved corporation by the deadline;
"(2) If a claimant whose claim was rejected by the dissolved corporation does not commence a proceeding to enforce the claim within 90 days from the effective date of the rejection notice.
"(d) For purposes of this section, `known claim' or `claim' includes unliquidated claims but does not include a contingent liability that has not matured so that there is no immediate right to bring *523 suit, or a claim based on an event occurring after the effective date of dissolution."
A review of the language in § 10-2B-14.06 indicates that the provision in the asset-purchase agreement requiring PTI to comply with § 10-2B-14.06 in the event it dissolved was not a wholesale prohibition on PTI's right to dissolvenor was it an impediment to dissolution at all. It merely would have required PTI, once it had officially dissolved, to notify known claimants of that dissolution. Thus, it is in no manner inequitable in this case to require that all the elements of the continuity-of-enterprise test, including the dissolution element, be met in order to establish corporate-successor liability.

IV. Conclusion

TSI sued PTI and PTL alleging breach of contract. After a bench trial, the trial court entered a judgment holding that PTI had breached its contract with TSI and that PTI and PTL were liable for that breach, PTL in its capacity as the corporate successor to PTI. We now affirm that judgment insofar as it holds that PTI breached its contract with TSI and awarded TSI damages as a result. However, because TSI did not submit evidence that would establish that PTL was the mere continuation of PTI, we reverse the judgment insofar as it holds that the damages awarded TSI should also be assessed against PTL, and we remand the cause for proceedings consistent with this opinion.
1061528AFFIRMED.
COBB, C.J., and SEE, LYONS, WOODALL, SMITH, BOLIN, PARKER, and MURDOCK, JJ., concur.
1061618REVERSED AND REMANDED.
SEE, LYONS, WOODALL, SMITH, BOLIN, and PARKER, JJ., concur.
COBB, C.J., and MURDOCK, J., concur in the result.
MURDOCK, Justice (concurring in case no. 1061528 and concurring in the result in case no. 1061618).
The main opinion quotes Asher v. KCS International, Inc., 659 So.2d 598, 600 (Ala. 1995), for the proposition that "`the rule [relating to the continuity-of-enterprise theory of successor liability] provides that the [predecessor] corporation must "cease[] ordinary business operations, liquidate[], and dissolve[]."'" 989 So.2d at 521 (emphasis in Asher). We have not been asked in this case to overrule Asher in this regard.
As the main opinion also notes, TSI argues in its brief that PTI is "for all practical purposes dissolved." TSI cites no authority, however, explaining why this Court should recognize a "practical" or de facto dissolution as sufficient to satisfy the above-quoted rule. See Dykes v. Lane Trucking, Inc., 652 So.2d 248, 251 (Ala. 1994) (holding that it is not the function of this Court to do a party's legal research or to make and address legal arguments for a party).
Based on the foregoing, I concur in the result reached in Part III of the main opinion (case no. 1061618). I otherwise concur in the main opinion.
COBB, C.J., concurs.
NOTES
[1] The invoice also indicated that TSI had made recommendations for changes to PTI's cellular-telephone service; however, it did not calculate the savings that would result from those changes. At trial, the president of TSI, David Hendriks, testified that he was at that time "still working on the cell phones, trying to pin down what to do" but that he decided to nevertheless begin billing for the other services to start receiving some fees.
[2] Among the assets PTI sold to PTL was PTI's entire telecommunications system. PTL thereafter replaced the system and the providers that PTI had used.
[3] No evidence has been adduced that would indicate time did not allow PTI to consult with TSI before it entered into the asset-purchase agreement with PTL.
[4] It appears from the record that TSI used either PTL's September 2004 or October 2004 cellular-telephone bill as a baseline.
[5] This Court reemphasized this principle in its concluding paragraph in Asher by referring to Brown v. Economy Baler Co., 599 So.2d 1 (Ala. 1992):

"In Brown, supra, this Court held that each of the four factors must be met before a successor corporation may be held liable based on the `mere continuation' of the enterprise exception. Although the Ashers presented evidence that many basic business operations were continued by KCS and that KCS took steps to hold itself out to the world to be a long-time manufacturer of Cruisers boats, the Ashers did not present substantial evidence of all four factors. As stated in Brown, supra, these factors are to be considered in the conjunctive, not in the alternative. Brown, 599 So.2d at 3."
659 So.2d at 601.
[6] Because we have already held that the second factor of the continuity-of-enterprise test was not met, we need not consider PTL's argument that the third factor was not met.