562 So.2d 152 (1989)
Harold Walter PIETZ
v.
ORTHOPEDIC EQUIPMENT COMPANY, INC., and Biomet, Inc.
88-908.
Supreme Court of Alabama.
December 22, 1989.
Rehearing Denied March 23, 1990.
*153 Robert E. Kirby, Jr., of Emond & Vines, Birmingham, for appellant.
Larry W. Harper and H.C. Ireland III of Porterfield, Bainbridge, Mims, Harper & Mills, Birmingham, for appellees.
SHORES, Justice.
Harold Walter Pietz, a student at Jacksonville State University, was injured when he fell during an ROTC field exercise on November 16, 1985. The Jacksonville State ROTC unit was required to rappel down a cliff, using equipment issued by the ROTC unit. Part of this equipment was the snap link mountain piton (a/k/a a carabiner) manufactured by Orthopedic Equipment Company, Inc. ("OEC"), a wholly-owned subsidiary of Biomet, Inc. As Pietz descended a steep cliff, the non-locking gatekeeper portion of the snap link opened, causing the rope to slacken and Pietz to free fall approximately 80 feet along the rock ledge. Pietz was severely injured in this fall.
Pietz filed suit against OEC under the Alabama Extended Manufacturer's Liability Doctrine, alleging defects in the design of the snap link. The complaint was amended to add F.I. Saemann Enterprises, Inc., and Biomet, Inc., as defendants. All three defendants filed motions for summary judgment, contending that the snap link was designed by the Federal Government and claiming immunity from liability for any design defects, under the government *154 contractor defense doctrine. The motions were originally heard by the trial judge on October 6, 1988. Summary judgment was entered in favor of F.I. Saemann Enterprises, Inc., at that time. The trial judge suggested that he certify the government contractor defense issue for Ala.R.App.P. Rule 5 review. However, after an attempt by the defendants to move the cases to the United States District Court and a remand of the case to state court, the trial judge heard the motions and entered summary judgment on behalf of OEC and Biomet on March 30, 1989. Pietz appeals from this judgment.
The issues before us are: (1) whether the trial judge erred in entering summary judgment based on the government contractor defense as set forth in Boyle v. United Technologies Corp., 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988), and (2) whether Biomet is a "successor in interest" to OEC.
The government contractor defense originated in the case of Yearsley v. W.A. Ross Construction Co., 309 U.S. 18, 60 S.Ct. 413, 84 L.Ed. 554 (1940). The Yearsley case involved a government contractor who built some river dikes for the government; the work caused erosion on land adjacent to the dikes. The United States Supreme Court stated, "[I]f [the] authority to carry out the project was validly conferred, that is, if what was done was within the constitutional power of Congress, there is no liability on the part of the contractor for executing its will." Id. at 20-21, 60 S.Ct. at 414-415. Two later cases created the Feres-Stencel doctrine, which were followed until Boyle. See, Feres v. United States, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950), and Stencel Aero Engineering Corp. v. United States, 431 U.S. 666, 97 S.Ct. 2054, 52 L.Ed.2d 665 (1977).
In Boyle, the United States Supreme Court reviewed the various government contractor defenses utilized by the circuit courts of appeals. The issue before the Boyle Court was whether a contractor providing military equipment to the Federal Government could be held liable under state tort law for injury resulting from a design defect. Boyle created a new government contractor defense and enunciated a three-part test:
"Liability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States."
487 U.S. 500 at 512, 108 S.Ct. 2510 at 2518.
The Supreme Court makes it clear in Boyle that whether the facts of the case establish the condition for the defense is a question for the jury. The Court, in remanding the case, wrote:
"It is somewhat unclear from the Court of Appeals' opinion, however, whether it was in fact deciding that no reasonable jury could, under the properly formulated defense, have found for the petitioner on the facts presented, or rather was assessing on its own whether the defense had been established. The latter, which is what the petitioner asserts occurred, would be error since whether the facts establish the conditions for the defense is a question for the jury."
487 U.S. 500 at 514, 108 S.Ct. 2510 at 2519 (emphasis added).
Further, the Supreme Court in Boyle cautioned that it was not suggesting that state law would generally be pre-empted by the government contractor defense. To illustrate, the Court used two examples:
"If, for example, the United States contracts for the purchase and installation of an air conditioning unit, specifying the cooling capacity but not the precise manner of construction, a state law imposing upon the manufacturer of such units a duty of care to include a certain safety feature would not be a duty identical to anything promised the government but neither would it be contrary. The contractor could comply with both its contractual obligations and the state-prescribed duty of care. No one suggests *155 that state law would generally be pre-empted in this context."
Id., 487 U.S. at 509, 108 S.Ct. at 2516 (emphasis added). The second example given by the Supreme Court was as follows:
"If, for example, a federal procurement officer orders, by model number, a quantity of stock helicopters that happen to be equipped with escape hatches opening outward, it is impossible to say that the government has a significant interest in that particular feature. That would be scarcely more reasonable than saying that a private individual who orders such a craft by model number cannot sue for the manufacturer's negligence because he got precisely what he ordered."
Id., 487 U.S. at 509, 108 S.Ct. at 2516.
Thus, it is clear that the question of whether a government contractor is to be shielded from liability becomes a question for the jury to weigh. It is also clear that the threshold question is whether the equipment is indeed "military equipment."
In the present case, the trial judge entered summary judgment for OEC and Biomet. Summary judgment is proper if the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Rule 56(c), A.R.Civ.P. Besides the question of whether the snap links are "military equipment," the facts of the case must be considered against the other tests enunciated by Boyle.
The first numbered test in Boyle requires that the court examine whether the United States approved reasonably precise specifications. The record is devoid of any evidence that the Government at any time considered and rejected the idea of a locking device on the gatekeeper feature of the snap link. In fact, it was the deposition testimony of Lowell Gard, a supervisor at OEC, who had general responsibility for in-plant operations during the manufacture of the snap links, that the workers at OEC did not have any discussion with the Government people about a safety locking nut or the lack of a locking nut on the snap link.
The second numbered test in Boyle is whether the equipment conformed to those specifications. The deposition testimony of John Wagoner, a quality control technician at OEC; Inez Feldman, a contract administrator; and Lowell Gard, was that OEC was aware of a problem in the specifications and had detected it soon after receiving the specifications. OEC applied for and obtained a deviation from the specifications provided by the Government after examining similar snap links manufacturered by competitors. John Wagoner testified in his deposition as follows:
"Q: The Government agreed to pay Orthopedic Equipment four hundred thousand dollars as a result of some defects in the original specifications, material specification?
"A. I wouldn't like to call them defects in the material specifications, but there was something dramatically wrong."
The deposition testimony of Lowell Gard was that the material change involved a substance called 4041 steel, which was used by a competing company that added lead to the alloy to prevent the material from warping during the heat treatment. There was also conflict in the deposition testimony as to whether the specifications were complied with and what testing of the snap links was done. Lowell Gard testified that the snap links were tested on a "feel deal" that entailed manually snapping the link. However, he did not recall that testing was done on each snap link.
The final numbered test is whether the supplier warned the United States Government about the dangers in the use of the equipment that were known to the supplier but not to the Government. The Court of Appeals for the Fifth Circuit has paraphrased the third test by stating that it requires that the "government contractor warn the government when the contractor has information which the government lacks." Trevino v. General Dynamics Corp., 865 F.2d 1474 at 1481 (5th Cir.), cert. denied, ___ U.S. ___, 110 S.Ct. 327 (1989). The deposition testimony of Gard, Wagoner, and Feldman indicates that OEC *156 knew that these snap links were to be used for mountain climbing. OEC sought a design deviation that would help OEC more easily manufacture the snap link. However, if there existed any design defects related to safety or performance, there is a genuine question whether the contractor informed the Government about them. The deposition testimony clearly presents a jury question as to whether the facts establish the condition for the utilization of the defense. Boyle, 487 U.S. at 513-14, 108 S.Ct. at 2519.
Furthermore, this case was brought under the Alabama Extended Manufacturer's Liability Doctrine statutes. There has been no opportunity for a jury to test the facts of the case against state law. The United States Supreme Court in Boyle says that it does not suggest that state law would generally be pre-empted by the government contractor defense. There is no federal statute authorizing pre-emption of state law in cases of this kind. In fact, the Congress of the United States has for 50 years resisted the lobbying efforts by defense contractors to pass such statutes.
Having determined that the government contractor defense is a question for the jury, we must determine whether defendant Biomet is a successor in interest to the manufacturer, Orthopedic Equipment Company, Inc. To determine successor liability, this Court has adopted the "basic continuity of the enterprise" test. See Andrews v. John E. Smith's Sons Co., 369 So.2d 781 (Ala.1979), Rivers v. Stihl, Inc., 434 So.2d 766 (Ala.1983), Turner v. Wean United, Inc., 531 So.2d 827 (Ala.1988). We wrote the following in Andrews:
"As a general rule, where one company sells or otherwise transfers all its assets to another company, the transferee is not liable for the debts and liabilities of the transferor unless (1) there is an express agreement to assume the obligations of the transferor, (2) the transaction amounts to a de facto merger or consolidation of the two companies, (3) the transaction is a fraudulent attempt to escape liability, or (4) the transferee corporation is a mere continuation of the transferor."
369 So.2d at 785 (citations omitted). We set out the factors of the "continuity of the enterprise" test in Turner v. Wean United, Inc., which adopts factors enunciated by the Michigan Supreme Court in Turner v. Bituminous Casualty Co., 397 Mich. 406, 244 N.W.2d 873 (1976):
"The first factor of the continuity of the enterprise test, and arguably the most important, is whether there is a basic continuity of the seller corporation, a retention of key personnel, assets and operation....
"The second factor of the continuity of enterprise test is whether the selling corporation dissolves shortly after the transfer of assets....
"The third factor to be considered is whether [the purchasing corporation] expressly assumed the liability of the [seller corporation]....
"The final factor of the continuity of enterprise test, as explained in Turner, is whether the purchasing corporation held itself out to the world as the effective continuation of the seller corporation."
531 So.2d 827, 830-31. This also presents a question for the jury.
For the reasons stated above, the judgment is reversed and the cause is remanded.
REVERSED AND REMANDED.
HORNSBY, C.J., and JONES, ADAMS, HOUSTON and KENNEDY, JJ., concur.
MADDOX and STEAGALL, JJ., dissent.
MADDOX, Justice (dissenting).
Harold Walter Pietz was injured when he fell during a rappelling exercise in ROTC.[1] *157 The carabiner used to secure the rope to Pietz and to slow his descent opened and caused him to fall rather than descend down the rope in a controlled manner. The carabiner was manufactured by Orthopedic Equipment Company (hereinafter "OEC"), a wholly-owned subsidiary of Biomet, Inc. Pietz sued OEC and Biomet under the Alabama Extended Manufacturer's Liability Doctrine ("A.E.M.L.D."); the trial court entered summary judgments for both defendants.
I believe the majority has incorrectly decided the issue of whether OEC and Biomet are shielded from liability by the government contractor defense set forth in Boyle v. United Technologies Corp., 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988).
The rationale behind the government contractor defense was set forth in Boyle as follows:
"We think that the selection of the appropriate design for military equipment to be used by our Armed Forces is assuredly a discretionary function within the meaning of this provision [28 U.S.C. § 2680(a), part of the Federal Tort Claims Act]. It often involves not merely engineering analysis but judgment as to the balancing of many technical, military, and even social considerations, including specifically the trade-off between greater safety and greater combat effectiveness. And we are further of the view that permitting `second-guessing' of these judgments [citation omitted] through state tort suits against contractors would produce the same effect sought to be avoided by the FTCA exemption. The financial burden of judgments against the contractors would ultimately be passed through, substantially if not totally, to the United States itself, since defense contractors will predictably raise their prices to cover, or to insure against, contingent liability for the Government-ordered designs. To put the point differently: It makes little sense to insulate the Government against financial liability for the judgment that a particular feature of military equipment is necessary when the Government produces the equipment itself, but not when it contracts for the production. In sum, we are of the view that state law which holds Government contractors liable for design defects in military equipment does in some circumstances present a `significant conflict' with federal policy and must be displaced." 487 U.S. at 511-12, 108 S.Ct. at 2517-18.
In order for a government contractor to be shielded by this defense, the following test must be met:
"Liability for design defects in military equipment cannot be imposed pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States."
487 U.S. at 512, 108 S.Ct. at 2518.
The majority states that carabiners do not appear to be "military equipment." This statement results from what I believe is a misrepresentation of the evidence. The carabiners were designed by and ordered by the Army for use in military maneuvers and exercises by military personnel. Rappelling is an essential element of the deployment of troops from helicopters and over cliffs, rough terrain, and the sides of buildings. Certainly the carabiners were not being used by the military for recreational or industrial purposes; therefore, I believe the majority errs in suggesting that the carabiner was not "military equipment." To say that "military equipment" included only such equipment as was actually used to fire some sort of ordnance fails to follow the test set out in Boyle.
In fact, it is clear from the record that OEC met all three parts of the test in Boyle. As to part (1), the specifications for the carabiners came from the Government; OEC had never manufactured carabiners before, and all the specifications were supplied *158 to it by the Government. The only design change made by OEC was a change it requested in the specifications to allow it to use a superior metal alloy in the manufacture of the carabiners; the Government approved this change, a change that had nothing to do with Pietz's injury.
This is not a case where the contractor provided all the specifications to the Government and the Government then merely "rubber stamped" the specifications, as was the situation in Trevino v. General Dynamics Corp., 865 F.2d 1474 (5th Cir.), cert. denied, ___ U.S. ___, 110 S.Ct. 327 (1989). Here, the Government did more than approve "reasonably precise specifications"it provided them.
The majority unfortunately justifies its holding by saying that there was no evidence that the Government considered a locking device for the carabiner. That has nothing to do with anything in this case. The Government is not the defendant here, and the issue, according to Boyle, is whether the Government approved reasonably precise specifications, which the Government obviously did in this case. The question of whether the Government should have, or could have, considered other designs is totally immaterial; it is not an issue.
Concerning the second element of the test, there is no evidence that the carabiner in question or any of the other carabiners were manufactured other than pursuant to the specifications provided by the Government. All the evidence indicates that OEC manufactured the carabiners to specification and that the Government accepted them and acknowledged that they met specifications.
As to the third part of the test, all the evidence indicated that OEC had no knowledge of any danger in the use of the carabiners that the Government itself did not have. The majority says that there is a genuine question of whether OEC informed the Government about design defects related to safety. Again, the majority misinterprets the record, for it shows that there was no evidence that OEC knew of any design defects related to safety, and there was no evidence that OEC had knowledge about carabiners, their use, and their safety that the Government did not already have. As mentioned above, OEC had never made carabiners before, and its employees had only a general knowledge of what they were to be used formountain climbing. Yet it is clear that the military had extensive knowledge of the use of carabiners. Indeed, because the military supplied the specifications for the carabiners, it is clear that the Government had knowledge about their uses and their dangers. Pietz contends that the carabiners would have been safer with a screw-down locking device on the gate part; the evidence showed that the military used carabiners both with and without the locking device. Clearly, the decision to use nonlocking carabiners is the type of discretionary function protected by 28 U.S.C. § 2680(a) and the government contractor defense.
I am absolutely convinced that the defendants in this case met the test in Boyle and are protected from liability under the A.E. M.L.D., and that the learned trial judge was eminently correct.
The rationale for the government contractor defense is to prevent what is, in effect, indirect lawsuits such as this against the Federal Government based upon its discretionary function of selecting military equipment; the costs of suits against contractors will only be passed on to the Government. The majority's opinion has the effect of allowing plaintiffs to sue the Federal Government in a state court.
Even if the Boyle defense was not controlling, the majority's opinion is incorrect, because Pietz was contributorily negligent, as a matter of law. The record shows that there were locking carabiners available at the ROTC exercise site. There were also "figure eight" rings at the site; these are solid devices shaped like the number "8" and are used in rappelling to hold the rope, and, being solid, they cannot open. Despite his knowledge that the locking carabiners and the "figure eight" rings were there, Pietz intentionally decided to use the nonlocking variety of carabiner when attaching himself to the rope. Pietz stated *159 that he "didn't see any need for" the locking carabiner, even though other students had used one. Pietz's deposition shows that he was knowledgeable in rappelling because he had rappelled many times; he had started rappelling when he was in the eighth grade, and he had been trained in rappelling by the Civil Air Patrol and by the ROTC.
I would affirm the judgment of the trial court. Therefore, I dissent.
STEAGALL, J., concurs.
NOTES
[1] To rappel, Pietz assembled a web seat and hooked the seat together with a carabiner; he looped an anchored rope through another carabiner and attached that carabiner to the one hooked to his web seat. The friction of the rope through the second carabiner slows the descent of the person rappelling; there are other devices that serve the function of slowing the movement of the rope. These include locking carabiners and "figure eight" rings.