LYONS, Justice.
Prattville Memorial Chapel and Memory Gardens, Inc. (“Memorial Chapel”), appeals from a judgment entered on a jury verdict against it and in favor of W.E. Parker on Parker’s claims alleging breach of contract and fraud. We affirm in part and reverse in part.

Procedural History

Parker sued Prattville Memory Gardens, Inc. (“PMG”), in the Autauga Circuit Court on January 27, 2005. Parker asserted claims of breach of contract and fraud arising from his purchase in 1976 of interment rights to 16 plots in PMG’s cemetery. PMG filed a timely answer to the complaint, and the parties proceeded with discovery. Although not named as a party to Parker’s action, Memorial Chapel, the current owner of the cemetery, which it purchased in 1993 from an entity that had purchased it from PMG, filed an answer to the complaint and a motion for a summary judgment on January 12, 2006. Subsequently, on February 1, 2006, Parker amended his complaint to name Memorial Chapel as a defendant. The trial court denied Memorial Chapel’s motion for a summary judgment and its later renewed motion for a summary judgment.
Parker’s claims were tried to a jury in March 2007. Pursuant to Rule 50(a), Ala. R. Civ. P., Memorial Chapel moved for a judgment as a matter of law (“JML”) at the close of Parker’s evidence and again at the close of all evidence. The trial court denied both motions, finding that Parker had presented sufficient evidence to submit his claims to the jury. Also at the close of all evidence, Parker moved for a JML on the issue whether Memorial Chapel was a continuation of PMG. Pursuant to that motion, and over Memorial Chapel’s objection, the trial court held as a matter of law that Memorial Chapel was a continuation of PMG and that it had assumed PMG’s liabilities and responsibilities.
Upon the trial court’s determination that Memorial Chapel was a continuation of PMG and therefore that PMG and Memorial Chapel were one and the same entity, the case was submitted to the jury against only Memorial Chapel. On this rationale, the jury was never given the opportunity to return a verdict against PMG. The trial court’s granting of Parker’s motion for a JML as to successor liability left Memorial Chapel as the lone remaining defendant, and PMG was thereby dismissed from the action.
Attorneys for Parker and Memorial Chapel gave closing arguments; however, neither party asked the official court reporter to transcribe the arguments, and no transcription of the arguments was made. The trial court charged the jury; several of the charges were given over Memorial Chapel’s objection. After deliberating, the *550 jury returned a $30,000 compensatory-damages award against Memorial Chapel on Parker’s breach-of-contract claim, a $50,000 compensatory-damages award against Memorial Chapel on Parker’s fraud claim, and a $1,000,000 punitive-damages award against Memorial Chapel on Parker’s fraud claim. The trial court entered a judgment on the jury’s verdict.
Memorial Chapel moved to remit the compensatory-damages awards and for a hearing pursuant to § 6 — 11—23(b), Ala. Code 1975, Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989), and Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986), to determine whether the punitive-damages award was excessive. Memorial Chapel also renewed its motion for a JML pursuant to Rule 50(b), Ala. R. Civ. P., and alternatively moved for a new trial and to alter, amend, or vacate the judgment pursuant to Rule 59, Ala. R. Civ. P. Additionally, Memorial Chapel moved the trial court to authorize a transcription of the parties’ closing arguments.
The trial court held a hearing on Memorial Chapel’s postjudgment motions and received evidence on the motion for a re-mittitur. The trial court entered an order denying each of Memorial Chapel’s post-judgment motions. Memorial Chapel then filed a timely notice of appeal.

Facts

At trial, the parties stipulated that in April 1976 a representative of PMG, Philip Gidiere, sold Parker interment rights to 16 grave sites in the cemetery owned by PMG for a total purchase price of $1,595. The parties also stipulated that Parker received a deed for the rights dated July 14, 1976. The parties did not stipulate to any other facts. Gidiere did not testify at trial, and the only evidence submitted to the jury regarding the events surrounding Parker’s purchase of the interment rights in 1976 was Parker’s testimony, a drawing, a written contract, and the July 14, 1976, deed.
Parker testified to the following facts: Parker was 71 years old at the time of trial. He first knew Gidiere in 1965 when he rented a house from Gidiere. Several times during the following years, Gidiere asked Parker to purchase interment rights in PMG’s cemetery; however, Parker declined. In the spring of 1976, Gidiere offered Parker what Gidiere called an “estate plot” in the cemetery. Parker and Gidiere went to the cemetery, where Gidi-ere showed Parker a specific plot, later identified as lot no. 60, in an undeveloped part of the cemetery. Without objection from Memorial Chapel, Parker testified regarding Gidiere’s description of what Parker would receive if he purchased the estate plot. Gidiere stated that Parker’s estate plot would be bordered by plants along the edge of the cemetery and between adjoining estate plots. Gidiere told Parker that the estate plot would have a 4-foot walkway down the center with a total of 16 graves, 2 rows of 4 graves on each side of the walkway. Gidiere also told Parker that the estate plot would have sections for plants, family markers, individual markers, and a bench. Gidiere advised Parker that his family could choose whether to have plants on either side of the estate plot and along the walkway.
Parker submitted a drawing into evidence, which he testified Gidiere gave him shortly after them visit to the cemetery (“the drawing”). The drawing is not dated; however, it matches Parker’s testimony regarding Gidiere’s description of the estate plot. According to the drawing, the center walkway was to be 4 feet wide, and each interment space was to be 3 feet 9 inches by 10 feet. During cross-examination, Memorial Chapel’s attorney asked: “Well, Philip Gidiere told you your plots *551 were going to look like [the drawing], didn’t he?” Parker answered: “Correct.” Parker testified that based on the drawing and on Gidiere’s description, he decided to purchase the estate plot, and he paid $1,595 for it.
Parker testified that after he paid for the estate plot, Gidiere delivered a written contract (“the contract”) to him. In response to questions asked by Memorial Chapel’s attorney during cross-examination, Parker testified that he owned the estate plot before he received any written contract from PMG. The contract, dated April 14, 1976, identified Parker as the purchaser and PMG as the seller of interment rights to 16 spaces in lot no. 60 in a part of the cemetery referred to as the Garden of Devotion.[1] The contract identified Prim Parker as Parker’s wife, but not as a purchaser. It stated a purchase price of $1,595. The contract did not specify that Parker was to receive an estate plot, nor did it describe the walkway, plants, and other features shown in the drawing. The contract provided that Parker would receive a deed for the interment rights and that Parker would “comply at all times with all Rules and Regulations heretofore or hereafter promulgated and adopted for the operation, care, and control of said Prattville Memory Gardens.” The contract also contained the following paragraphs:
“9. Entire Agreement: This instrument represents the entire agreement of the parties hereto, and shall be binding upon and inure to the benefit of heirs, next of kin, personal representatives, successors and assigns of the parties.
“10. PURCHASER CERTIFIES THAT NO ORAL OR WRITTEN STATEMENTS, PROMISES, REPRESENTATIONS OR GUARANTEES OTHER THAN THOSE CONTAINED HEREIN HAVE BEEN MADE BY SELLER, ITS AGENTS, SERVANTS, OR EMPLOYEES, WITH REFERENCE TO CARE AND MAINTENANCE OF THE SAID PLOT OR PRATTVILLE MEMORY GARDENS, OR OTHERWISE IN RELATION TO THIS AGREEMENT.”
(Capitalization in original.) Gidiere signed the contract on behalf of PMG.
Parker subsequently received a deed dated July 14, 1976, that granted interment rights in the 16 spaces in lot no. 60 in PMG’s Garden of Devotion to “Dr. W.E. Parker and/or Prim H. Parker (wife).” As was the case with the contract, the deed did not specify that Parker was to receive an estate plot, nor did it describe the walkway, plants, and other features shown in the drawing. Also as was the case with the contract, the deed provided that it was “subject to the Rules and Regulations now in effect, or which may hereafter be adopted or enacted for the control, regulation, and government of said cemetery.” The deed provided that those rules and regulations were “on file for inspection in the office of [PMG]” and were incorporated by reference.
Parker did not sign the contract or the deed. He testified that he did not sign anything with respect to his purchase. Without objection from Memorial Chapel, Parker’s attorney asked: “[W]hat paper describes your agreement with that cemetery?” and Parker answered: “They didn’t have one. I had his [Gidiere’s] word and his description, and the drawing, to back it up. That’s what he told me.”
*552 After Parker received the deed, he and his wife, Prim, divorced. Parker testified that, after the divorce, Prim had no interest in the estate plot and she would not be buried there. The parties did not submit any other evidence regarding Prim’s interest, or lack thereof, in the estate plot.
As of the date of trial, Parker had not buried or attempted to bury anyone in the cemetery. The record shows that the cemetery was operated by three companies between Parker’s April 1976 purchase and the March 2007 trial. PMG operated the cemetery until 1989, when it was sold to Douglas Massey, Timothy Massey, Curtis Massey, Sr., Curtis Massey, Jr., James Seal, and Jefferson Memorial Companies, Inc. (collectively “Jefferson”). Jefferson continued to operate the cemetery under the name “Prattville Memory Gardens.” It also developed a funeral home on the property. The evidence showed that, when Jefferson purchased the cemetery, it was assigned all PMG’s “pre-need contracts,” contracts for interment spaces purchased before burial was needed. The purchase agreement pursuant to which Jefferson purchased the cemetery from PMG provided that Jefferson assumed no liabilities, debts, or obligations of PMG’s other than those stated in the agreement.
In 1993, Jefferson sold the cemetery and funeral home to Memorial Chapel, a corporation owned by Tom and Carol Huntington; Tom Huntington was an employee of Jefferson. Memorial Chapel operated the cemetery and funeral home from 1998 through the trial in March 2007. Upon Memorial Chapel’s purchase of the cemetery, the Huntingtons placed a photograph of Gidiere in the funeral-home lobby with a plaque stating: “Founder of Prattville Memory Gardens.” The asset-purchase agreement between Memorial Chapel and Jefferson provided that Memorial Chapel was to “assume the aggregate amount of all contractual liabilities ... to provide funeral and interment services, interment spaces and related merchandise, of [Jefferson] and all preceding owners of the cemetery facility .... ” (Emphasis added.) A separate document specified Jefferson’s transfer to Memorial Chapel of the pre-need contracts. That document provided: “[Memorial Chapel] does hereby assume and agree to perform the contractual obligations of [Jefferson] pertaining to the Pre-Need Contracts .... ” The parties do not dispute that Parker’s was one of the pre-need contracts Memorial Chapel assumed. The asset-purchase agreement between Jefferson and Memorial Chapel also provided that, except for pre-need contracts: “[Memorial Chapel] shall not assume by virtue of this agreement or the transactions contemplated herein any obligation or liability of [Jefferson] of any kind whatsoever .... ”
Parker testified that between his purchase of the plot in 1976 and the trial in 2007, whenever he learned that the cemetery had a new owner, he would call the cemetery office “just to verify.” In 1992, in response to one such call, Parker received a letter from Jefferson confirming that he had 16 “cemetery lots” in the Garden of Devotion. Parker testified: “Whenever they would confirm that I had the sixteen spaces, automatically in my mind, I assumed I had the estate.” Parker also occasionally drove by the cemetery to see his plot. On cross-examination he confirmed that between 1976 and 2007 the plot was never developed with a walkway, plants, or other features as shown in the drawing. Parker explained that he understood that he would have what was shown in the drawing when he first buried someone in one of the interment spaces in the plot.
In July 2004, Parker visited the cemetery and noticed that someone had been *553 buried near his plot. Parker asked Carol Huntington to confirm that his plot had not been encroached. During the course of their conversation, Parker told Carol Huntington that he had an “estate” plot and Carol Huntington denied knowledge of the existence of any “estate plot” in the cemetery. Parker later showed the drawing to Carol Huntington and Marilyn Kil-gore, a Memorial Chapel employee. Both women denied that the cemetery had any plots laid out as shown in the drawing. They told Parker that lot no. 60, in which he had interment rights, consisted of 16 standard burial spaces.
Tom Huntington, Carol Huntington, and Marilyn Kilgore each testified that Memorial Chapel’s file regarding Parker’s purchase did not include a copy of the drawing and that they had never seen a similar drawing before. They also testified that after Parker showed them the drawing, they searched Memorial Chapel’s records for similar drawings and found no plots like those shown on the drawing. Carol Huntington testified that she found nothing in Memorial Chapel’s files that referred to “estate plots” and that none currently existed in the cemetery. Tom and Carol Huntington both testified that they had never heard the term “estate plot” before Parker’s July 2004 inquiries.
Tom and Carol Huntington testified that Parker had interment rights in 16 standard burial spaces but that he had no right to or space for a walkway or the other features shown on the drawing. Tom Huntington testified that Parker would not receive those amenities. According to Tom Huntington, granting Parker the amenities shown on the drawing would require the equivalent of four additional burial spaces and there was no room among the plots adjoining lot no. 60 to grant Parker what he requested. At the time of trial, interment rights to a single grave site in the cemetery sold for $1,032.
Tom Huntington, Carol Huntington, and Marilyn Kilgore also testified that the rules and regulations of the cemetery did not allow, and never had allowed, plants between interment spaces as shown in the drawing. Rule 56 of the rules and regulations Gidiere had drafted stated: “All work and all planting of any kind on all lots and graves is strictly prohibited.” The same rule is included in the rules and regulations the Huntingtons used to operate the cemetery. Tom Huntington testified that plants were not allowed between interment spaces because the plants would have to be removed to make space for funerals at nearby spaces.
The individual burial spaces shown on Memorial Chapel’s maps, including those in lot no. 60, are 4 feet by 11 feet, somewhat larger than those spaces shown on the drawing. James Seale, one of the owners of the cemetery during the time Jefferson owned it, testified that when Jefferson purchased the cemetery, it received maps of the burial spaces and that he did not recall Jefferson receiving any drawings. Seale further testified that the only maps Jefferson had were those it had received from PMG. Tom Huntington testified that none of the maps Memorial Chapel had obtained from Jefferson showed burial spaces laid out like those in the drawing, with walkways and plants among the burial spaces. Tom Huntington denied that Memorial Chapel had altered any of the maps it received from Jefferson.
Parker presented testimony from George Creel, who the documentary evidence showed was president of PMG in 1989. According to Creel, PMG had sold “family estates,” like the one shown in the drawing, and he had personally purchased one. Creel testified that, when he was president of PMG, the cemetery maps *554 showed these family estates, and the maps were given to Jefferson upon Jefferson’s purchase of the cemetery in 1989. He also testified that PMG’s records regarding Parker’s plot, which were given to Jefferson, included a copy of the drawing.
Creel also testified that, sometime after Jefferson purchased the cemetery, he saw Tom Huntington, who was then employed by Jefferson, removing plants from between the family estates. Tom Huntington denied doing so and testified that there never were plants between burial spaces. Creel testified that, if Parker had presented a body for burial while Creel was president'of PMG, he would have allowed Parker to bury the body in accordance with the drawing. Memorial Chapel called Creel’s credibility into question during cross-examination, soliciting testimony that Creel had been convicted of theft by deception on an unrelated matter.
Parker testified that he would not have considered purchasing 16 standard grave sites without the walkway between the sites and the other amenities. Parker testified that he was worried about his own burial, and, because he had health problems, he worried that the issue of his burial would not be resolved before he died. Parker stated that after his first conversation with Carol Huntington in July 2004, he felt stunned, shocked, and a little angry. Parker testified that, after he' showed her the drawing in August 2004, he had a bad feeling. He described feeling angry and thought that he had been treated wrongfully, unfairly, and unjustly. He stated that he thought about the situation nearly every day and that he did not want the same thing to happen to others. On cross-examination, Parker admitted that he had suffered from depression after his divorce and that he had been on prescription medicine for depression at some time in the past.

Analysis

Memorial Chapel raises more than 20 issues on appeal. Our resolution of several of these issues pretermits discussion of the rest.
I. Continuation and Assumption of Liabilities as to the Fraud Claim Against Memorial Chapel
Memorial Chapel argues that the trial court erred in denying its motion for a JML as to Parker’s fraud claim, specifically as to whether it may be held liable for tort claims against PMG arising from activities that predated Memorial Chapel’s acquisition of the cemetery. Memorial Chapel also argues that the trial court erred in granting Parker’s motion for a JML and holding that Memorial Chapel is liable for tort claims predicated on the pre-acquisition conduct of PMG. We apply the following standard of review:
“When reviewing a ruling on a motion for a JML, this Court uses the same standard the trial court used initially in deciding whether to grant or deny the motion for a JML. Palm Harbor Homes, Inc. v. Crawford, 689 So.2d 3 (Ala.1997). Regarding questions of fact, the ultimate question is whether the nonmovant has presented sufficient evidence to allow the case to be submitted to the jury for a factual resolution. Carter v. Henderson, 598 So.2d 1350 (Ala.1992). The nonmovant must have presented substantial evidence in order to withstand a motion for a JML. See § 12-21-12, Ala.Code 1975; West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury. Carter, 598 So.2d at 1353. In reviewing *555 a ruling on a motion for a JML, this Court views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences as the jury would have been free to draw. Id. Regarding a question of law, however, this Court indulges no presumption of correctness as to the trial court’s ruling. Ricwil, Inc. v. S.L. Pappas & Co., 599 So.2d 1126 (Ala.1992).”
Waddell & Reed, Inc. v. United Investors Life Ins. Co., 875 So.2d 1143, 1152 (Ala.2003).
This Court has stated:
“As a general rule, where one company sells or otherwise transfers all its assets to another company, the transferee is not liable for the debts and liabilities of the transferor unless (1) there is an express agreement to assume the obligations of the transferor, (2) the transaction amounts to a de facto merger or consolidation of the two companies, (3) the transaction is a fraudulent attempt to escape liability, or (4) the transferee corporation is a mere continuation of the transferor. 15 Fletcher, Cyclopedia Corporations § 7122 (Perm, ed.1973); 19 Am.Jur.2d § 1546.”
Andrews v. John E. Smith’s Sons Co., 369 So.2d 781, 785 (Ala.1979). See also Lloyd Noland Found., Inc. v. City of Fairfield Healthcare Auth., 837 So.2d 253, 265 (Ala.2002); Colonial Bank of Alabama v. Coker, 482 So.2d 286, 292 (Ala.1985).
During trial, Parker attempted to show that Memorial Chapel had expressly assumed all the liabilities of its predecessors and thus was liable in tort pursuant to the first exception stated above. However, the asset-purchase agreement between Memorial Chapel and its predecessor, Jefferson, contained an express assumption of contractual liabilities and a disclaimer of all other liabilities, which would exclude the tort liability upon which the jury ver-diet in favor of Parker on his fraud claim was based. Accordingly, the first exception to the general rule regarding transferees does not apply to Parker’s fraud claim. Parker never argued that the second or third exception applies. Therefore, we must determine whether the trial court erred when it entered a JML in Parker’s favor based on the fourth exception—that Memorial Chapel was a mere continuation of its predecessors.
Memorial Chapel contends that the continuation exception applies only to liabilities arising out of product-liability claims. However, this Court has applied the exception in other contexts, and Memorial Chapel has not presented any reason for us to limit the application of the exception to product-liability actions. See, e.g., Parrett Trucking, Inc. v. Telecom, Solutions, Inc., 989 So.2d 513, 519-20 (Ala.2008) (considering the exception in a breach-of-contract action); Asher v. KCS Int'l, Inc., 659 So.2d 598, 601 (Ala.1995) (considering the exception in a breach-of-warranty action); Coker, 482 So.2d at 293 (considering the exception as to guarantee issued by bank’s predecessor).[2] Accordingly, the exception may apply to cases outside the product-liability context, and we will consider whether Parker presented sufficient evidence showing that it applies here.
In Turner v. Wean United, Inc., 531 So.2d 827, 830 (Ala.1988), this Court explained that there must be substantial evidence of four factors to support a finding that a successor corporation is a mere continuation of its predecessor:
*556 “ ‘1) There was basic continuity of the enterprise of the seller corporation, including, apparently, a retention of key personnel, assets, general business operations and even the [seller’s] name.
“ ‘2) The seller corporation ceased ordinary business operations, liquidated, and dissolved soon after distribution of consideration received from the buying corporation.
“ ‘3) The purchasing corporation assumed those liabilities and obligations of the seller ordinarily necessary for the continuation of the normal business operations of the seller corporation.
“ ‘4) The purchasing corporation held itself out to the world as the effective continuation of the seller corporation.’ ”
(Quoting Turner v. Bituminous Gas. Co., 397 Mich. 406, 430, 244 N.W.2d 873, 883-84 (1976).) Parker contends that he is not required to establish each of these four factors, if the totality of the transaction demonstrates that Memorial Chapel was a continuation of its predecessors. Parker bases this contention on this Court’s statements in Andrews, supra, on Rivers v. Stihl, Inc., 434 So.2d 766 (Ala.1983), and on cases from other jurisdictions.
This Court’s 1976 decision in Andrews stated the general rule that a transferee is not liable for the debts and liabilities of the transferor and identified four exceptions to that rule. In determining whether to apply the rule and its exceptions in a product-liability context, this Court considered a case from the Michigan Supreme Court, Turner v. Bituminous Casualty Co., supra. This Court noted the Michigan court’s holding that “there may be a cause of action where the totality of the transaction demonstrates a basic continuity of the enterprise.” Andrews, 369 So.2d at 785. This Court then found the following reasoning from Turner v. Bituminous Casualty Co. persuasive: “ ‘Justice would be offended if a corporation which holds itself out as a particular company for the purpose of sales, would not be estopped from denying that it is that company for the purpose of determining products liability.’ ” 369 So.2d at 785 (quoting Turner v. Bituminous Cas. Co., 397 Mich, at 426, 244 N.W.2d at 882). Although this Court in Andrews found the estoppel theory persuasive, it declined to base a ruling on that theory because the plaintiff had not asserted it in the complaint. Id. This Court in Andrews did not expressly adopt a totality-of-the-transaction approach instead of the four-factors requirement for determining whether a successor corporation is a mere continuation of its predecessor. Indeed, Andrews did not expressly examine the four factors at all, and we cannot say that the statements in Andreios precluded this Court’s subsequent application of the factors.
This Court’s 1983 decision in Rivers v. Stihl, Inc., supra, quoted Andrews as having held that “a transferee may be held liable for its predecessor’s liabilities ‘where the totality of the transaction demonstrates a basic continuity of the enterprise.’” 434 So.2d at 771 (quoting the discussion of Turner v. Bituminous Casualty Co. in Andrews, 369 So.2d at 785). The Rivers opinion stated that this Court had adopted in Andrews a “ ‘basic continuity of the enterprise’ test.” 434 So.2d at 771. This Court reversed the trial court’s summary judgment for the defendant, finding that the plaintiff had presented sufficient evidence from which a jury could have found a continuity of the enterprise. 434 So.2d at 772. This Court never stated the four factors of the continuation exception, but based its finding on several “factors” from Andrews and Turner v. Bituminous Casualty Co., including an express assumption of liabilities.[3]
*557 Parker also relies on cases from the Michigan Court of Appeals and the United States District Court for the Western District of Michigan to show that a plaintiff need not submit evidence of each factor in order to show a continuity of the enterprise under the totality-of-the-transaction approach. Ammend v. BioPort, Inc., 322 F.Supp.2d 848 (W.D.Mich.2004); Pele v. Bendix Mach. Tool Corp., 111 Mich.App. 343, 314 N.W.2d 614 (1981). However, this Court expressly applied the four factors in 1988 in Turner v. Wean United, Inc., supra. Turner cited Andrews and Rivers, but went further than those cases did and expressly applied all four factors, ultimately concluding that the successor corporation did not fall within the continuation exception. Since our decision in Turner, this Court has rejected arguments that the four factors of the continuation exception are not mandatory.
In Brown v. Economy Baler Co., 599 So.2d 1, 3 (Ala.1992), this Court stated that the “factors are to be considered in the conjunctive, not in the alternative.” Accordingly, we affirmed the trial court’s summary judgment for the defendant because the plaintiff had failed to present substantial evidence of the second and third factors. Likewise, in Asher v. KCS International, Inc., 659 So.2d at 601, the plaintiff argued that “when the totality of the circumstances demonstrates a basic continuity of enterprise it should not be necessary that each of the four factors be proved.” Based on Brown, we disagreed, stating that “each of the four factors must be met before a successor corporation may be held liable based on the ‘mere continuation’ of the enterprise exception.” 659 So.2d at 601. Most recently, in Pamtt Trucking, Inc. v. Telecom Solutions, Inc., this Court stated: “[U]nder the continuity-of-enterprise test adopted by this Court, there is no ‘weighing’ of the factors; rather, as we stated in Asher, there must be ‘substantial evidence of each of the four factors.’ ” 989 So.2d at 521-22. In Par-rett Trucking, we reversed the trial court’s judgment, holding that the successor corporation could not be held liable as a continuation of the predecessor corporation because the plaintiff had not presented evidence that the predecessor corporation had been dissolved. 989 So.2d at 522.
Parker argues that Brown and Asher are inconsistent with Andrews and Rivers and that we should follow a totality-of-the-transaction approach to determine whether Memorial Chapel was a mere continuation of PMG instead of requiring proof of all four factors. However, our decisions in Brown and Asher and more recently in Parr-ett Trucking clearly state, over objections identical to Parker’s, that the four factors are mandatory. In a single sentence in a footnote to his brief on appeal, Parker states that Brown and Asher should be overruled. However, Parker does not cite any basis upon which we may overi*ule those cases. Parker acknowledges this Court’s decision in Pamtt Trucking in a subsequent footnote but states that that case is distinguishable because it did not apply the totality-of-the-transaction approach. Parker has not made a sufficient showing that we should overrule these cases and depart from an approach this Court has followed for the last 20 years. In Ex parte First Alabama Bank, 883 So.2d 1236, 1245 (Ala.2003), we stated:
*558 “Justice Houston, writing specially in Southern States Ford, Inc. v. Proctor, 541 So.2d 1081 (Ala.1989), embraced a useful standard for weighing the need for change against the advantages of settled principles of law under the doctrine of stare decisis. He posed the question as follows: whether the ratio decidendi of earlier precedent would “ ‘hypothetically be consented to today by the conscience and the feeling of justice of the majority of all those whose obedience is required by [that] rule of law?’ ” Southern States Ford, Inc., 541 So.2d at 1093 (quoting Laun, Stare Decisis, 25 Va. L.Rev. 12, 22 (1938)).”
Applying this question to our consideration of whether to depart from the rule established by Brown and Asher, we cannot say that the “conscience and feeling of justice of the overwhelming majority whose obedience is required” would be shocked by requiring adherence to the view that each of the four factors must be present before a successor corporation may be held liable under the continuation-of-the-enterprise exception. 883 So.2d at 1245-46. Therefore, on the basis of stare decisis, we decline to overrule Brown and Asher.
Accordingly, we consider whether Parker presented substantial evidence of each element of the continuation exception and whether he was entitled to a JML on that issue. As to the first element of the continuation exception, we must consider whether there was a basic continuity of PMG’s enterprise, including a retention of key personnel, assets, general business operations, and PMG’s name. Turner, 531 So.2d at 830. It is undisputed that first Jefferson and then Memorial Chapel retained the same basic assets and maintained the same general business operations as PMG. Furthermore, upon its purchase of the cemetery, Jefferson continued operating under the name “Prattville Memory Gardens.” This evidence tends to show a continuity of the enterprise.
However, upon Memorial Chapel’s purchase of the cemetery and funeral home from Jefferson, it operated under the name “Prattville Memorial Chapel and Memory Gardens.” Furthermore, the evidence presented at trial showed that the primary shareholders, owners, and operators of PMG, Jefferson, and Memorial Chapel changed with each sale of the cemetery. This evidence tends to demonstrate a lack of continuity of the enterprise between Memorial Chapel and its predecessors.
Regarding the second factor of the continuation exception, Parker must have presented evidence indicating that PMG and/or Jefferson “ ‘ceased ordinary business operations, liquidated, and dissolved soon after distribution of consideration received’ ” upon the sale of the business. Turner, 531 So.2d at 830. This Court recently held that “[t]here must be evidence of dissolution” and that testimony that the predecessor company may have been dissolved is insufficient to satisfy this element. Parrett Trucking, 989 So.2d at 521-22. Although the evidence clearly shows that PMG no longer operated the cemetery after it was purchased by Jefferson and that Jefferson no longer operated the cemetery after it was purchased by Memorial Chapel, no evidence shows whether Jefferson and PMG dissolved soon after those sales.
Regarding PMG, Parker cites his attorney’s statement to the trial court that PMG no longer existed at the time of trial. However, statements of counsel are not evidence. See, e.g., Carver v. Foster, 928 So.2d 1017, 1025 (Ala.2005). Furthermore, even if the statement were evidence, the statement does not show that PMG dissolved “soon after” Jefferson’s purchase of the cemetery. Regarding the dissolu *559 tion of Jefferson, Parker cites an August 30, 1993, document captioned “Assignment and Assumption of Pre-Need Contracts” between Jefferson and Memorial Chapel, which was signed by Massey-Seal Corporation “fik/a Jefferson Memorial Companies, Inc.” According to Parker, this “formerly known as” designation following the signature shows that Jefferson no longer existed as of the date of the assignment of the pre-need contracts to Memorial Chapel. However, the “formerly known as” designation alone does not show that Jefferson had actually been dissolved; it merely shows that the Massey-Seal Corporation was once known by that name. Parker offers no other evidence showing that Jefferson or PMG were dissolved soon after the distribution of the proceeds of their sales of the cemetery.
Regarding the third element of the continuation exception, it is undisputed that Memorial Chapel and Jefferson “ ‘assumed those liabilities and obligations of [their predecessors] necessary for the continuation of the normal business operations’ ” of the cemetery. Turner, 531 So.2d at 830. Regarding the fourth element of the continuation exception, whether first Jefferson and then Memorial Chapel held themselves out as the effective continuation of PMG, 531 So.2d at 830, Parker cites the fact that Memorial Chapel continues to include the phrase “Memory Gardens” in its name and the fact that the Huntingtons placed a photograph of Gidiere in the lobby of the funeral home with a plaque that says “Founder of Prattville Memory Gardens.” By this evidence, Parker argues that Memorial Chapel has sought to profit from PMG’s accumulated goodwill and therefore should be liable for PMG’s liabilities. Memorial Chapel contends that because it operated under a different name, Parker cannot satisfy the fourth factor of the continuation exception.
Parker had the burden of raising substantial evidence of each of the four factors of the continuation exception. Brown, 599 So.2d at 3. As to the second factor — the dissolution — there is a lack of substantial evidence in view of the speculation necessary to treat “fik/a Jefferson Memorial Companies, Inc.” as evidence of timely dissolution of Jefferson. This Court has stated that “[t]here must be evidence of dissolution.” Parrett Trucking, 989 So.2d at 521. Because Parker failed to offer substantial evidence of timely dissolution of the predecessor corporations, Memorial Chapel was entitled to a JML on this issue and, consequently, on Parker’s fraud claim. The trial court thus erred in granting Parker’s motion for a JML and denying Memorial Chapel’s motion for a JML on this issue. Accordingly, we reverse the trial court’s judgment against Memorial Chapel on Parker’s fraud claim.
II. Breach^of-Contract Claim. Against Memorial Chapel
A. Overview
Memorial Chapel does not dispute that it assumed PMG’s contractual liabilities when it purchased the cemetery from Jefferson. We therefore address Memorial Chapel’s arguments regarding Parker’s breach-of-contract claim against it dealing with issues other than the assumption of liability.
B. Failure to Join an Indispensable Party
Memorial Chapel argues that the trial court’s judgment against it on Parker’s breach-of-contract claim is due to be reversed because, it argues, Parker failed to join an indispensable party. Citing only the 1976 deed that conveyed interment rights to “Dr. W.E. Parker and/or Prim H. Parker,” Memorial Chapel argues that *560 Parker’s former wife, Prim, has a property interest in Parker’s interment rights and, therefore, is an indispensable party to the breach-of-contract action. Parker contends that Memorial Chapel waived this argument by failing to raise it in the trial court; however, the failure to join an indispensable party may be raised for the first time on > appeal. See Town of Dauphin Island v. Point Props., Inc., 620 So.2d 602, 604-05 (Ala.1993).
Although Memorial Chapel may raise this issue for the first time on appeal, we nonetheless decline to consider it because Memorial Chapel has failed to comply with the requirements of Rule 28(a)(10), Ala. R.App. P. This Court has stated:
“Rule 28(a)(10), Ala. R.App. P., requires that arguments in an appellant’s brief contain ‘citations to the cases, statutes, other authorities, and parts of the record relied on.’ Further, ‘it is well settled that a failure to comply with the requirements of Rule 28(a)(10) requiring citation of authority in support of the arguments presented provides this Court with a basis for disregarding those arguments.’ State Farm Mut. Auto. Ins. Co. v. Motley, 909 So.2d 806, 822 (Ala.2005) (citing Ex parte Showers, 812 So.2d 277, 281 (Ala.2001)). This is so, because ‘ “it is not the function of this Court to do a party’s legal research or to make and address legal arguments for a party based on undelineated general propositions not supported by sufficient authority or argument.’” Butler v. Town of Argo, 871 So.2d 1, 20 (Ala.2003)(quoting Dykes v. Lane Trucking, Inc., 652 So.2d 248, 251 (Ala.1994)).”
Jimmy Day Plumbing & Heating, Inc. v. Smith, 964 So.2d 1, 9 (Ala.2007). In Jimmy Day Plumbing, the appellant’s argument consisted of three sentences and one citation to a general proposition of law with no discussion of how the law related to the facts presented in that case. Similarly, Memorial Chapel’s argument on this issue consists of a single paragraph and one citation to Taliaferro v. Goff Group, 947 So.2d 1073 (Ala.Civ.App.2006),[4] for the general proposition that a trial court’s judgment may be reversed for failure to join an indispensable party. Memorial Chapel does not discuss the rules regarding joinder, particularly Rule 19, Ala. R. Civ. P. Nor does it discuss the two-step process courts follow in determining whether a party is necessary and indispensable. E.g., Liberty Nat’l Life Ins. Co. v. University of Alabama Health Servs. Found., P.C., 881 So.2d 1013, 1021-22 (Ala.2003). Nor does it offer any analysis regarding how the facts of this case apply to the joinder rules. Accordingly, as to its joinder argument, Memorial Chapel has not complied with the requirements of Rule 28(a)(10), Ala. R.App. P., and we will not consider the argument.
C. Parol Evidence
Memorial Chapel argues that the trial court erred in admitting parol evidence regarding the contract between Parker and PMG. Memorial Chapel bases its argument on the Statute of Frauds, on Alabama law regarding the interpretation of deeds, and on the parol-evidence rule. Parker argues that the trial court did not err in admitting parol evidence because Memorial Chapel did not object when the evidence was offered at trial. Therefore, Parker argues, Memorial Chapel waived any argument that the evidence was inadmissible.
*561 In Alfa Mutual Insurance Co. v. Northington, 561 So.2d 1041 (AIa.1990), a policyholder sued his insurance company alleging breach of contract and fraud. The policyholder, Northington, contended that his agreement with the insurance company, Alfa, included coverage for the loss of personal property due to theft; Alfa denied coverage based on a written policy, and Northington sued. 561 So.2d at 1042. During trial, Alfa moved for a directed verdict,[5] arguing that any oral negotiations between Northington and Alfa’s representative were merged into a written policy. 561 So.2d at 1043. Therefore, according to Alfa, no evidence supported Northington’s contention that his policy covered loss of personal property due to theft. The trial court denied the motion, and Alfa appealed.
On appeal, this Court noted that during the trial of the case, “North-ington sought to introduce the testimony concerning the oral negotiations for the purpose of proving the terms of his contract with Alfa and ... the testimony was admitted into evidence without any objection.” 561 So.2d at 1043-44. This Court recognized that once contracts have been reduced to a writing and the parties have acknowledged that the writing represents the complete agreement between them, parol evidence of the negotiations will not be admitted to alter or contradict the writing. However, in Alabama, parties “may try their case on evidence that would otherwise be inadmissible upon proper objection and ... where evidence violative of the parol evidence rule is admitted without objection, it may be considered and allowed such force and effect as its weight entitles it in construing the agreement of the parties.” 561 So.2d at 1044. Because Alfa did not object to the admission of the par ol evidence Northington offered to prove the terms of his policy, this Court held that the trial court did not err in denying Alfa’s motion for a directed verdict. Accord, Alfa Life Ins. Corp. v. Jackson, 906 So.2d 143, 156 (Ala.2005).
Similarly, the trial transcript in this case shows that Parker submitted par-ol evidence regarding his oral negotiations with Gidiere for the purpose of proving the terms of the contract. Specifically, Parker testified regarding Gidiere’s oral representations in order to show that he had contracted to receive an estate plot, which included a walkway, plants, and special markers. Memorial Chapel did not object to the admission of this evidence. In fact, Memorial Chapel’s attorney solicited testimony from Parker regarding Gidiere’s oral representations. Because Memorial Chapel failed to object during trial to the admission of parol evidence regarding the terms of Parker’s agreement with PMG, it now has no basis on which to argue that the evidence should have been excluded. Like Alfa in Northington, Memorial Chapel has waived its arguments regarding parol evidence.
D. Statements During Closing Argument
Memorial Chapel argues on appeal that it is entitled to a new trial because Parker’s attorney made what it claims were prejudicial statements during closing arguments. However, neither party requested that the closing arguments be transcribed, either before or during the trial. After the jury returned its verdict, Memorial Chapel filed a motion requesting that the closing arguments be transcribed from the court reporter’s backup audio recording of the proceedings. The trial *562 court denied the motion, stating: “The rules do not require an official court reporter to [transcribe] arguments of counsel. If closing was taken by this Court’s former official court reporter ... and he is compensated for the same, they may be transcribed. Otherwise, this Court will not order that they be transcribed.” Memorial Chapel then arranged for the closing arguments to be transcribed and subsequently moved for the transcription to be made part of the record. Parker opposed that motion.
In its ruling on Memorial Chapel’s post-judgment motions, the trial court stated the following regarding Memorial Chapel’s motion to supplement the record with a transcription of the closing arguments:
“Neither [Parker] nor [Memorial Chapel] requested that the official court reporter transcribe closing arguments during the trial of this case. Thereafter, after being requested by defense counsel, this Court’s former official court reporter attempted to transcribe the closing arguments by reviewing his backup tape. That transcription included a great number of 'unintelligible’ entries.”
In fact, in the 42-page transcript of the closing arguments, the court reporter made 32 notes that the argument was unintelligible. Instead of certifying that the transcript of the closing arguments was a full, true, and correct transcript of the proceedings, the court reporter’s certificate states only that he has “transcribed from tape recordings the aforesaid transcript and [that] the foregoing pages contain as correct a transcript of the proceedings to the best of [his] understanding and to the best of [his] ability.” The trial court concluded:
“The official court reporter would have written and transcribed closing arguments if he had been requested to do so. However, counsel did not request the same and the Court will not include as a part of this record something that cannot be certified as accurate by the official court reporter. Therefore, [Memorial Chapel’s] motion is DENIED.”
Accordingly, the trial court did not consider whether the statements were prejudicial, and the transcript has not been made a part of the court reporter’s record on appeal. Based on Memorial Chapel’s failure to request a transcript, on the number of “unintelligible” portions of the transcript, and on the court reporter’s inability to fully certify the transcript, we cannot say that the trial court exceeded its discretion in denying Memorial Chapel’s motion to supplement the record. See, e.g., Ex parte Edwards, 450 So.2d 464, 465-66 (Ala.1984) (reviewing trial court’s decision whether to supplement appellate record under Rule 10(f), Ala. RApp. P., under abuse-of-discretion standard).
Parker contends that “[b]ecause there is no record of the allegedly improper statement, this issue presents nothing for this Court to review.” Johnston v. Frost, 547 So.2d 528, 529 (Ala.1989). We agree. Memorial Chapel contends that it need only show “ ‘with reasonable certainty what was said in the court below.’ ” Mathews v. Tuscaloosa County, 421 So.2d 98, 100 (Ala.1982) (quoting Flowers v. Slate, 269 Ala. 395, 397, 113 So.2d 344, 345 (1959)). Memorial Chapel rages this Court to consider the transcript attached to its motion to supplement the record. According to Memorial Chapel, because those portions of the transcript it now challenges are not the portions that contain notes that the argument is unintelligible, it has shown with reasonable certainty what was said in the court below, and its argument should be considered.
In Mathews, upon which Memorial Chapel relies, the plaintiff made a timely objection during the defendant’s opening *563 statement; however, the objection was not recorded because of an inadvertent error by the court reporter. 421 So.2d at 99. The plaintiff moved, pursuant to Rule 10(f), Ala. R.App. P., to supplement the record; the plaintiff supported its motion with affidavits from the court reporter and counsel for both parties. Id. The trial court denied the motion but included the supporting affidavits in the record on appeal. Additionally, the record on appeal included a transcript of the parties’ arguments regarding the objection. That transcript contained references to the objectionable statement sufficient to show its substance and the basis for the trial court’s ruling. 421 So.2d at 100. The record of the trial proceedings, therefore, contained sufficient undisputed information for this Court to discern that the statement violated consistent precedent and that the trial court’s ruling on the objection was erroneous. Id.
Here, the court reporter’s record on appeal does not contain any information regarding or reference to the closing arguments. Therefore, unlike Mathews, there is nothing in the record from which this Court can determine the substance of the statements Memorial Chapel challenges on appeal. We agree with Parker that, “[b]e-cause there is no record of the allegedly improper statement, this issue presents nothing for this Court to review.” Johnston, 547 So.2d at 529.
Additionally, unlike the plaintiff in Matlmus, Memorial Chapel has not complied with the requirements of Rule 10, Ala. R.App. P., and the trial court has not approved any supplement to the record on appeal that shows the substance of the closing arguments. This Court has stated: “Rule 10(d), [Ala. R.App. P.], is the appropriate rule with which [a party] must comply in order to supplement the record when no report of the proceedings was made. This rule carefully fixes the procedure and time limits that must be followed in order to effect such supplementation.” Todd v. United Steelworkers of America, AFL-CIO-CLC, 441 So.2d 889, 891 (Ala.1983). Specifically, Rule 10(d) requires that the trial court approve a statement of the proceedings that were omitted from the record.[6] The record on appeal does not show that Memorial Chapel attempted to comply with Rule 10(d). However, even if we were to construe Memorial Chapel’s proffer of the incomplete transcript as compliant with the rule, it is apparent that Parker objected to the transcript and that the trial court did not approve it. For the reasons stated above, we cannot conclude that the trial court exceeded its discretion in declining to approve the transcript of *564 the closing arguments prepared after the conclusion of the trial proceedings.
Furthermore, this Court has stated:
“ ‘This Court has generally held that improper arguments by an attorney are not sufficient grounds for a new trial without a timely objection and a ruling by the trial court or a refusal by the trial court to make a ruling. Lawrence v. Alabama Power Co., 885 So.2d 986, 987 (Ala.1980). The exception to this rule is “where the comment is so prejudicial that its effect is ineradicable.” Banner Welders, Inc. v. Knighton, 425 So.2d 441, 450 (Ala.1982).’
“Isbell v. Smith, 558 So.2d 877, 881 (Ala.1989), cert. denied, 498 U.S. 821, 111 S.Ct. 68, 112 L.Ed.2d 42 (1990).”
Alfa Mut. Ins. Co. v. Moreland, 589 So.2d 169, 171 (Ala.1991). Even if we were to consider the transcript, it is apparent that Memorial Chapel did not raise a timely objection to the statements it now challenges on appeal, nor did it obtain a ruling on any objection from the trial court that this Court can review. Additionally, without a complete transcript, Memorial Chapel has not shown, and we cannot determine, whether the statements at issue were so prejudicial as to have an ineradicable effect. Therefore, we will not consider Memorial Chapel’s argument regarding Parker’s closing argument.
E. Damages for Mental Anguish
1. Remittitur
As to Parker’s breach-of-contract claim, the jury awarded Parker $30,000 in compensatory damages. Memorial Chapel argues that the trial court impermissibly instructed the jury that it could award damages for mental anguish and that Parker proved only $4,128 in actual damages. Accordingly, Memorial Chapel argues that the trial court should have ordered a re-mittitur as to the compensatory-damages award for breach of contact. To support its argument, Memorial Chapel cites only National Security Fire & Casualty Co. v. Vintson, 414 So.2d 49, 52 (Ala.1982), for the proposition that the “general rule in this state is that mental anguish is not a recoverable element of damages arising from breach of contract.”
The evidence submitted to the jury showed that, at the time of trial, individual burial spaces in the cemetery were selling for $1,032. The evidence further showed that in order for Parker to have the walkway, plants, special markers, and other amenities he says he had been promised, he would have to have the equivalent of 20 burial spaces. Parker already owned 16 burial spaces; however, the Huntingtons testified that Parker would not be given the extra features and that there was physically no space in the Garden of Devotion for Parker to have the 4 additional spaces necessary to do so. Purchasing 20 burial spaces in another part of the cemetery at $1,032 per space would cost Parker $20,640. Memorial Chapel contends that, because interment spaces cost $1,032, Parker suffered actual damages of only $4,128 — i.e., the cost of four additional spaces. Without showing how he calculated the amount, Parker contends that he received 388 fewer square feet from Memorial Chapel than Gidiere had promised him and that the decreased value as a result of that loss of space is $9,437.
The record shows that the trial court instructed the jury as follows:
“[Tjhere’s two types of compensatory damages claimed, if you find that the plaintiff is entitled to recover. One are the economic, pure add them up, count them, money damages, okay? And with regard to that, the law says that the purpose of such damages is to put the *565 plaintiff in as good a position as he would have been with regard to a contract, if it hadn’t been broken. Now, it says where a contractual duty or obligation is so related to matters of mental concern or apprehensiveness, or with the feelings of the party to whom a duty is owed, that breach of duty will necessitate or reasonably result in mental anguish or suffering, and if such matters that are reasonably within the contemplation of the parties when a contract is made, then in that event, then the party is entitled to recover and he would be entitled to recover such sum as would reasonably compensate him for mental anguish and physical suffering.”
This Court has stated:
“An award of damages for mental anguish generally is not allowed in breach-of-contract actions in Alabama. Ruiz de Molina v. Merritt & Furman Ins. Agency, 207 F.3d 1351 (11th Cir.2000), citing Vincent v. Blue Cross-Blue Shield, Inc., 373 So.2d 1054, 1056 (Ala.1979).
“ ‘The ground on which the right to recover such damages [for mental anguish] is denied, is that they are too remote, were not within the contemplation of the parties, and that the breach of the contract is not such as will naturally cause mental anguish. “Yet where the contractual duty or obligation is so coupled with matters of mental concern or solicitude, or with the feelings of the party to whom the duty is owed, that a breach of that duty will necessarily or reasonably result in mental anguish or suffering, it is just that damages therefor be taken into consideration and awarded.” ’
“F. Becker Asphaltum Roofing Co. v. Murphy, 224 Ala. 655, 656, 141 So. 630, 631 (1932) (citations omitted).”
Bowers v. Wal-Mart Stores, Inc., 827 So.2d 63, 68-69 (Ala.2001). It is pursuant to this exception that the trial court instructed the jury. To determine whether the trial court erred in instructing the jury as to the availability of mental-anguish damages for breach of a contract and subsequently in failing to order a remittitur of the damages the jury awarded, we must determine whether this exception applies to Parker’s breach-of-contract claim.
Memorial Chapel cites authority regarding the general prohibition of mental-anguish damages for breach of contract; however, it does not point us to any authority regarding the application of the mental-concern or solicitude exception, the legal issue upon which its argument turns. Rule 28(a)(10), Ala. RApp. P., provides that an appellant’s argument must set out “the contentions of the appellant/petitioner with respect to the issues presented, and the reasons therefor, with citations to the cases, statutes, other authorities, and parts of the record relied on.” We have stated that “it is not the function of this Court to do a party’s legal research or to make and address legal arguments for a party based on undelineated general propositions not supported by sufficient authority or argument.” Dykes v. Lane Trucking, Inc., 652 So.2d 248, 251 (Ala.1994). Rather, it is the appellant’s duty to present “relevant legal authorities that support [its] position.” White Sands Group, L.L.C. v. PRS II, LLC, 998 So.2d 1042, 1058 (Ala.2008). Although Memorial Chapel has cited one case stating the general prohibition of mental-anguish damages, it has not cited any authority regarding the mental-concern or solicitude exception. Accordingly, as to mental-anguish damages, Memorial Chapel has not complied with the requirements of Rule 28(a)(10), and we will not address the issue.[7]
*566 2. Stipulation
Based on our refusal to order a remittitur as to the damages awarded for mental anguish, we must address Memorial Chapel’s argument that the trial court erred in failing to instruct the jury that Parker stipulated that he never sought treatment for mental anguish. During trial, Memorial Chapel attempted to elicit testimony regarding Parker’s history of mental anguish and his failure to seek treatment for the mental anguish he alleges he suffered as a result of Memorial Chapel’s actions. Parker objected to the testimony, and the parties argued the objection outside the hearing of the jury. During their argument, Parker stipulated that he had not sought psychological treatment for mental anguish resulting from Memorial Chapel’s actions. The trial court otherwise sustained the objection.
Thereafter, Memorial Chapel did not attempt to communicate Parker’s stipulation to the jury. Furthermore, at no time before the claims were submitted to the jury did Memorial Chapel request the trial court to instruct the jury as to the stipulation, although it now argues that the trial court erred to reversal in failing to do so. Parker contends that, if the trial court erred in this respect, we should not reverse the trial court’s judgment because Memorial Chapel invited the error. See Lawrence v. Alabama Power Co., 385 So.2d 986, 987 (Ala.1980). . Memorial Chapel responds, stating simply that it “obviously ... intended for the information to be presented to the jury .... ”
This Court has stated:
“It is ... well settled ‘that a party may not induce an error by the trial court and then attempt to win a reversal based on that error. “A party may not predicate an argument for reversal on ‘invited error,’ that is, ‘error into which he has led or lulled the trial court.’ ” ’ Mobile Infirmary Med. Ctr. v. Hodgen, 884 So.2d 801, 808 (Ala.2003) (quoting Atkins v. Lee, 603 So.2d 937, 945 (Ala.1992), quoting in turn Dixie Highway Express, Inc. v. Southern Ry., 286 Ala. 646, 651, 244 So.2d 591, 595 (1971)).”
White Sands Group, L.L.C. v. PRS II, LLC, 998 So.2d at 1057. If the trial court in fact erred in failing to instruct the jury on this issue, Memorial Chapel invited that error by failing to make any attempt to present Parker’s stipulation to the jury. It further invited error by failing to request the trial court to instruct the jury on the stipulation. If Memorial Chapel had desired such an instruction, it should have requested one; we will not reverse the judgment of the trial court for failing to do what Memorial Chapel did not request.

Conclusion

We reverse the trial court’s judgment against Memorial Chapel as to Parker’s fraud claim, and we affirm the trial court’s judgment against Memorial Chapel on Parker’s breach-of-contract claim; we remand this case for the entry of a judgment consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
SEE, WOODALL, STUART, SMITH, BOLIN, and PARKER, JJ., concur.
MURDOCK, J., concurs in part and concurs in the result.
COBB, C.J., recuses herself.

. The cemetery is divided into seven sections referred to as gardens; each garden has a different name.

. Cf. Andrews, 369 So.2d at 785 (stating the exception as part of a general rule and declining to hold that the exception did not apply in product-liability actions).

. Although Parker does not cite them, this Court's decisions in Matrix-Churchill v. *557 Springsteen, 461 So.2d 782 (Ala.1984), and Colonial Bank of Alabama v. Coker, 482 So.2d 286 (Ala.1985), also discuss the continuation exception in more general terms. In Springsteen, this Court applied only three of the four factors as ''guidelines,” 461 So.2d at 787, and in Coker this Court simply noted some of the "traditional indicia” of the continuation exception, 482 So.2d at 293.

. Memorial Chapel incorrectly states that Tal-iaferro was decided by this Court; it was decided by the Court of Civil Appeals.

. Rule 50(a), Ala. R. Civ. P., as amended effective October 1, 1995, renamed the “motion for a directed verdict” as a “motion for judgment as a matter of law.”

. Rule 10(d), Ala. R.App. P., provides:
"If no report of the evidence or proceedings at a hearing or trial was made, or if a transcript is unavailable, the appellant may prepare a statement of the evidence or proceedings from the best available means, including the appellant's recollection. If the appellant prepares such a statement, the appellant shall serve it on tire appellee within 28 days (4 weeks) after filing the notice of appeal; the appellee, within 14 days (2 weeks) after service, may serve on the appellant objections or proposed amendments to the statement. ... If the appellee serves on the appellant any objections or proposed amendments, then, within 7 days (1 week) after service, the appellant shall file the statement and any objections or proposed amendments with the trial court for settlement and approval. Within 21 days (3 weeks) after the filing, the trial court shall rule, settling any questions regarding the objections and proposed amendments, and issuing an approved statement of the evidence or proceedings. The statement, either as approved by the court or as issued by the court after its ruling, shall be filed with the clerk of the trial court, who shall include it in the record on appeal.”

. We note that we do not decide whether this contract falls within the mental-concern or *566 solicitude exception identified in Bowers v. Wal-Mart Stores, Inc., 827 So.2d at 68-69. There is simply insufficient argument and authority allowing us to reverse the trial court's judgment or, indeed, to make any determination as to this issue.